Roy Clarke, Respondent, *v.* Richard A. Ackerman, Appellant.

First Department, March 8, 1935.

*Herbert Plaut* of counsel [*Harold Davis* with him on the brief; *Plaut & Davis*, attorneys], for the appellant appearing specially.

*James E. Mulcahy*, for the respondent.

*John J. Bennett, Jr.*, Attorney-General of the State of New York, *David T. Wilentz*, Attorney-General of the State of New Jersey, and *Julius Henry Cohen*, General Counsel for Port of New York Authority [*Warren H. Gilman*, *Austin J. Tobin*, *William A. Pallmé* and *Wilton D. Cole* with them on the brief], as *amici curiæ*.

Townley, J. This summons was served under section 52 of the Vehicle and Traffic Law, which provides that " The operation

by a nonresident of a motor vehicle or motor cycle *on a public highway in this state,* or the operation *on a public highway in this state* of a motor vehicle or motor cycle owned by a nonresident if so operated with his consent, express or implied, shall be deemed equivalent to an appointment by such nonresident of the secretary of state to be his true and lawful attorney upon whom may be served the summons in any action against him, growing out of any accident or collision in which such nonresident may be involved while operating a motor vehicle on such a public highway."

On September 17, 1933, an automobile bearing a West Virginia license and owned by defendant, a non-resident, was involved in an accident with plaintiff's motorcycle at or near a lamp post designated No. 116 on the George Washington Bridge. This spot is a little over 800 feet west of the center of the bridge. The lamp post, No. 116, is also approximately 165 feet east of the low-water mark on the New Jersey side of the Hudson river. Defendant was crossing from New Jersey to New York.

Under the treaty of 1834 (Laws of 1834, chap. 8) between the States of New York and New Jersey, by article first, it was provided that " The boundary line between the two states of New-York and New-Jersey, from a point in the middle of Hudson River opposite the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the *middle of the said river, of the bay of New York,* of the waters between Staten-Island and New-Jersey, and of Raritan bay, to the main sea, except as hereinafter otherwise particularly mentioned."

It thus appears that the tort alleged in the complaint occurred within the territorial confines of the State of New Jersey. In view of the phrasing of section 52 of the Vehicle and Traffic Law, it would seem that regardless of any further questions of jurisdiction, the Legislature had not seen fit, even if it had the power, to permit substituted service of process in cases involving accidents on a highway that was not within the agreed territorial limits of New York State.

The question has been complicated, however, by the claim that under article third of the treaty of 1834, the courts of the State of New York have jurisdiction of torts occurring anywhere on the George Washington Bridge and that the provisions of section 52 of the Vehicle and Traffic Law are applicable to the situation arising therefrom.

Article third reads in part as follows:

"Article Third. The state of New-York shall have and enjoy exclusive jurisdiction *of and over all the waters of the bay* of New-

York, and *of and over all the waters of Hudson river* lying west of Manhattan island and to the south of the mouth of Spuytenduyvel creek, and of and over the lands covered by the said waters to the low water mark on the westerly or New-Jersey side thereof; subject to the following rights of property and of jurisdiction of the state of New-Jersey, that is to say:

" 1. The state of New-Jersey shall have the exclusive right of property in and to the land under water lying west of the middle of the bay of New-York and west of the middle of that part of the Hudson river which lies between Manhattan island and New-Jersey.

" 2. The state of New-Jersey shall have the exclusive jurisdiction of and over the wharves, docks and *improvements* made, and to be made, on the shore of the said state, and of and over all vessels aground on said shore, or fastened to any such wharf or dock; except that the said vessels shall be subject to the quarantine or health laws, and laws in relation to passengers, of the state of New-York, which now exist or which may hereafter be passed."

The " exclusive jurisdiction " referred to in article third has been construed to refer to police jurisdiction over offenses happening anywhere on the river. There was never any intention on the part of New Jersey to give up its prerogatives of sovereignty or any of the territory granted it by the treaty. As was said by the Court of Appeals in *People* v. *Central Railroad Co. of New Jersey* (42 N. Y. 283, 299): " This provision [second subdivision of article third], and particularly the language of the *exception,* seem to me to be the key to this whole compact, so far as it relates to this question of jurisdiction.

" Confessedly, vessels afloat upon the waters of the bay or the river are, and were intended to be subject to the exclusive jurisdiction of New York; but whenever they were fastened to any wharf or dock upon the New Jersey shore, or were aground upon said shore, they became attached to the soil of New Jersey, and were under her exclusive jurisdiction.

" The moment they became thus affixed to the land of New Jersey in the bed of the river or on the shore, the jurisdiction of New York over them was to cease, except in the language of said proviso: ' They shall be subject to the quarantine or health laws, in relation to passengers, of New York.'

" This exception explains the object and nature of the jurisdiction intended to be given to New York. It was to be a police jurisdiction of and over all vessels, ships, boats or craft of every kind that did or might float upon the surface of said waters, and over all the elements and agents or instruments of commerce, while the same were afloat in or upon the waters of said bay and river for

quarantine and health purposes, and to secure the observance of all the rules and regulations for the protection of passengers and property, and all fit governmental control designed to secure the interests of trade and commerce in said port of New York, and preserve thereupon the public peace.

" By this exception, it was designed that vessels afloat upon said bay and river should not escape or evade the quarantine laws, and the laws relating to passengers of New York, by coming to anchor on or near the New Jersey shore, or by becoming attached to the wharves or docks on said shore or adjacent thereto, but in all other particulars they were left subject to the laws of New Jersey."

In a later case, *Ferguson* v. *Ross* (126 N. Y. 459), the Court of Appeals again said: " The purpose of vesting exclusive jurisdiction over these waters, in the State of New York, was to promote the interests of commerce and navigation, which would, as supposed, be best subserved by giving to this state the exclusive control and regulation of the waters of the bay and harbor of New York."

The Supreme Court of the United States, writing in *Central Railroad Co.* v. *Jersey City* (209 U. S. 473, 479), by Mr. Justice HOLMES, said: " But we agree with the State courts that have been called on to construe that part of the agreement that the purpose was to promote the interests of commerce and navigation, not to take back the sovereignty that otherwise was the consequence of Article I." We think, therefore, that article third has been so limited by judicial interpretation as to make the present claim of jurisdiction untenable.

It is possible to consider this bridge as an " improvement " made to or on the shore of New Jersey under article third, subdivision 2, of the treaty. On the New Jersey shore the bridge is supported by one great pier placed upon the bed of the river east of the low-water mark. The floor of the bridge extending out to the center may be analogized to a wharf or pier. If such a comparison is just, then under the specific exceptions of the treaty, jurisdiction is retained by New Jersey to the center of the river.

Two statutes, chapter 146 of the Laws of New Jersey for 1932, and chapter 251 of the Laws of New York for 1934, incorporate a practical legislative construction of the treaty which is of some aid in interpreting the question. Section 2 of each of these acts provides for the punishment for violation of certain rules and regulations " within the state." Furthermore, there are other sections in the acts which indicate that ordinary territorial limitations of jurisdiction were to be observed in relation to offenses on any

vehicular crossing. (See, also, Laws of New Jersey, 1932, chap. 113.)

Aside from any precedent cited, however, we think that article third must be interpreted to some extent in the light of the situation as understood by the Commissioners in 1834. It seems clear that at that time neither tunnels nor bridges were in their minds. We hold, therefore, that the jurisdiction granted to New York State by article third of the treaty does not authorize the courts of this State to take jurisdiction of a non-resident under any powers granted by section 52 of the Vehicle and Traffic Law and under the circumstances herein set forth.

The rights of New York State under articles sixth and seventh of the treaty and under article third in so far as jurisdiction is conferred on New York State." of and over all the waters " of the river and harbor, are not passed on except to the extent necessary to decide the particular question here presented.

The order should be reversed, with twenty dollars costs and disbursements, and the motion granted.

MARTIN, P. J., MERRELL, O'MALLEY and UNTERMYER, JJ., concur.

Order reversed, with twenty dollars costs and disbursements, and motion granted.