This is an appeal from a decree of distribution of the Hudson County Orphans Court.
On September 10th, 1928, the decedent, Anthony Gutkowski, an infant, was a passenger on a ferry crossing a portion of the navigable waters of the Hudson River lying within a tidewater basin in Jersey City known locally as "The Gap." The ferry is a small boat propelled by a single oar and serves persons journeying from the downtown section of Jersey City to the railroad yards of the Lehigh Valley Railroad. On the occasion mentioned, the boat was involved in a collision with a steam lighter and as a result the decedent was thrown into the water and drowned. He resided in the City of Bayonne, New Jersey, and was survived by his father, mother, three brothers and five sisters.
The father, William Gutkowski, was appointed administrator adprosequendum by the surrogate of Hudson County. The said administrator instituted an action in the United States District Court for the Southern District of New York to recover damages for the wrongful death of his son. This suit was never brought to trial. The case was settled for $3,950 and after payment of fees and expenses there remained a balance of $2,050 in the hands of the administrator who subsequently qualified as general administrator.
It appears that in May, 1928, a judgment had been entered against the father and mother of the decedent in the Bayonne District Court and as a result a receiver was appointed of the rights and credits of the said father and mother. The receiver contended that the moneys in the hands of the general administrator should be distributed under the directions of the Death Act in force in the State of New York, Decedent Estate Law,Consol. Laws, c. 13 §§ 130-134, which act provides that the recovery shall go to the father and mother to the exclusion of the brothers and sisters. The receiver contends that under the agreement between the State of New Jersey and the State of New York made in 1833, R.S. *Page 95 52:28-1, jurisdiction over the place of the accident is vested in the State of New York and that, therefore, the law of that state is controlling. The administrator contended that distribution should be made under R.S. 2:47-1 et seq. and R.S.3:5-4. The administrator, therefore, applied to the Orphans Court for instructions pursuant to R.S. 3:7-77.
The judge of the Hudson County Orphans Court, in his memorandum, said: "* * * the moneys in the hands of the administrator must be distributed in accordance with the mandate of the Death Act of the State of New Jersey, that is to say, to the father and mother and brothers and sisters of the decedent, share and share alike. I do not intend to write a long opinion involving treaty rights and conflict of jurisdiction. I decide the issue squarely on the point that the administrator having acquired his title from New Jersey he must act in accordance with the laws of New Jersey in making distribution."
A decree was entered in the Orphans Court in accordance with the views expressed by the judge of the Orphans Court.
Under the law of conflicts the law of the place or wrong covers not only the right of action but the distribution of the recovery as well. Morss v. Allen, 120 N.J. Law 203; 199 Atl. Rep. 414;Restatement, Conflicts, §§ 391, 393. If the place of death under the treaty of 1833 is subject to the law of New York the statute of distribution of that state controls and vice versa.
The controversy between the State of New York and the State of New Jersey, concerning their respective rights in the boundary formed by the North or Hudson River, has been reviewed in a number of cases. It is sufficient to note that in 1833 commissioners were appointed by each state who met and reached an accord which was submitted to and favorably acted upon by the respective legislatures of each state and subsequently approved by the Congress of the United States. The New Jersey statute confirming the agreement appears in P.L. 1834 p. 118, now R.S.52:28-1 et seq.
The provisions which pertain to this case are as follows:
"52:28-2. Location of boundary line.
"Article I. The boundary line between the states of New York and New Jersey, from a point in the middle of Hudson river, opposite *Page 96 
the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the middle of the said river, of the bay of New York, of the water between Staten island and New Jersey, and of Raritan bay, to the main sea, except as hereinafter otherwise particularly mentioned."
"52:28-4. Hudson river and bay of New York.
"Article III. The state of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the bay of New York, and of and over all the waters of Hudson river, lying west of Manhattan island, and to the south of the mouth of Spuyten Duyvel creek, and of and over the lands covered by the said waters to the low-water mark on the westerly or New Jersey side thereof, subject to the following rights of property and jurisdiction of the state of New Jersey, that is to say:
"1. The state of New Jersey shall have the exclusive right of property in and to the land under water, lying west of the middle of the bay of New York and west of the middle of that part of the Hudson river which lies between Manhattan island and New Jersey.
"2. The state of New Jersey shall have the exclusive jurisdiction of and over the wharves, docks and improvements made and to be made on the shore of the said state, and of and over all vessels aground on said shore, or fastened to any such wharf or dock, except that the said vessels shall be subject to the quarantine or health laws, and laws in relation to passengers of the state of New York, which now exist or which may hereafter be passed.
"3. The state of New Jersey shall have the exclusive right of regulating the fisheries on the westerly side of the middle of the said waters; provided, that the navigation be not obstructed or hindered."
Appellant contends that under the treaty of 1833 the State of New York had an exclusive extra-territorial jurisdiction over the waters of the Hudson River west of the middle of that river extending as far as the low-water mark on New Jersey shore. The respondent contends that the extra-territorial jurisdiction given to the State of New York was limited to a police power under which that state had the right to regulate matters pertaining to health, commerce and safe navigation.
Mr. Justice Blatchford said in Re Devoe Manufacturing Co.,108 U.S. 401, 413; 2 S.Ct. 894, 902; 27 L.Ed. 764: "* * * The jurisdiction thus conceded to New York [in article IV] is, clearly, a limited one, and cannot, in any view, be regarded as altering the general boundary line; and as the tug, when seized, was on the New Jersey side of that line, she was within the State of New Jersey, not because she was *Page 97 
fastened to a dock on the shores of New Jersey, but because she was within that part of the waters between Staten Island and New Jersey which, by article 1 of the agreement, is set apart to New Jersey."
In the case of State v. Babcock, 30 N.J. Law 29, the defendant was indicted by the Hudson County grand jury for obstructing the free navigation of the Hudson River by placing vessels and wrecks on the New Jersey shore both above and below the low-water line. The indictment was removed to the Supreme Court by writ of certiorari, tried before the Circuit Court, and the jury found the defendant guilty. The defendant appealed and a new trial was ordered.
Mr. Justice Elmer, who was one of the commissioners appointed under the act of 1833, wrote the opinion from which I quote:
"As persons not acquainted with the circumstances of the dispute between the States of New Jersey and New York, in regard to their respective rights in the river and bay separating them, have sometimes complained of the compact agreed upon in the year 1833, after a long and troublesome controversy, and after the failure of two previous attempts to terminate it by agreement, as having conceded too much to New York, it may be proper to take this opportunity of explaining the obvious motives which induced the commissioners and the legislature of this state to consent to the terms finally adopted. * * *
"When the commissioners of New Jersey and New York again met, in 1833, and it was found that those of the latter state appeared to be desirous of arranging the dispute upon fair and liberal terms, but deemed it indispensable that their great commercial emporium should have the exclusive control of the police of the surrounding waters, and full power to establish such quarantine regulations as should be found necessary, the commissioners of this state deemed it wise to secure the exclusive property in the soil to the middle of the river, and exclusive jurisdiction over the wharves, docks, and other improvements made or to be made on the Jersey shore, and of the vessels fastened thereto, and the right to regulate the adjacent fisheries, leaving to New York, which was *Page 98 
thought to be quite as much a burthen as a privilege, the exclusive jurisdiction over the offenses in or upon the waters or the land covered by the water outside of the low water mark. As it was thought possible that the time might come when Perth Amboy should be an important city, like exclusive jurisdiction over the adjacent waters to low water mark on Staten Island was secured to this state. Nothing has since occurred to make the propriety of this arrangement doubtful; on the contrary, there is every reason to believe that it has secured important rights to this state, which otherwise might have been lost."
In the case of Central Railroad Co. v. Jersey City,70 N.J. Law 81; 56 Atl. Rep. 239; affirmed, 72 N.J. Law 311;61 Atl. Rep. 1118, the plaintiff sued out a writ of certiorari to review the right of the city to tax lands lying between the middle of New York Bay and its low-water line on the New Jersey shore. It was contended that under the treaty of 1833 the lands were not within the jurisdiction of New Jersey. In the opinion of the court in that case Mr. Justice Garrison said (70 N.J. Law (atp. 90): "* * * in so far as it bears upon the right of New Jersey to exercise the sovereign power of taxation over the lands of the prosecutor, is the sole question now presented for decision."
He then continues: "The question is one of first impression, being entirely distinct from the right to exercise civil or criminal jurisdiction, which has hitherto been the only aspect in which the compact has been presented for judicial consideration."
In the opinion the said justice also cites State v. Babcock,supra; People v. Central Railroad Co., infra, and Ferguson
v. Ross, infra, the first of which touched upon criminal jurisdiction and the other two upon civil jurisdiction. The case of People v. Central Railroad Co., turns upon the specific reservation which gives New Jersey the right to control its wharves, and Ferguson v. Ross is a quasi-criminal proceeding and did not deal with civil jurisdiction.
The said justice, further in the opinion, reviews the case ofFerguson v. Ross and said (at p. 91 of 70 N.J. Law), as follows: "* * * The five judges who made up the majority of the court not only decided that the word `jurisdiction' was *Page 99 
used as a term of jurisprudence, but held further that it was designed to confer only a qualified and limited juridical authority of the sort that is above described in language taken from the prevailing opinion. It is not now necessary or proper to decide whether the term was employed by the commissioners in a broad juridical sense, or with the qualified meaning placed upon it by the majority opinion of the New York court. All that is to the present purpose is that its equivalency to sovereignty or governmental jurisdiction was distinctly disavowed. * * *"
He concludes the opinion in the following language: "* * * and that the sovereignty of the State of New Jersey is co-extensive with the territorial limits thus established, subject only to such extra-territorial jurisdiction of a juridical character as was, by the said compact, conceded to the State of New York, from which it results that the sovereign power of taxation over all the territory thus defined resides in the State of New Jersey."
The above-mentioned case was affirmed by the Court of Errors and Appeals on the opinion below. It then went to the United States Supreme Court in which Mr. Justice Holmes wrote an opinion which is reported as Central Railroad Company of New Jersey v.Jersey City, 209 U.S. 473; 28 S.Ct. 592, 593; 52 L.Ed. 896. The railroad contended before the United States Supreme Court that article III of the said treaty gave New York exclusive jurisdiction over the land as well as the water above it. The court disposed of this contention in the following language:
"* * * But we agree with the state courts that have been called on to construe that part of the agreement, that the purpose was to promote the interests of commerce and navigation, not to take back the sovereignty that otherwise was the consequence of article 1. This is the view of the New York as well as of the New Jersey Court of Errors and Appeals, and it would be a strange result if this court should be driven to a different conclusion from that reached by both the parties concerned. Ferguson v.Ross, 126 N.Y. 459; 27 N.E. Rep. 954; People v. CentralRailroad Co., 42 N.Y. 283. This opinion is confirmed by the judgment delivered by one of the commissioners in State v.Babcock, 30 N.J. *Page 100 Law 29 [1 Vr. 29]. Again, as was pointed out by the state court, the often-expressed purpose of the appointment of the commissioner (sic) and of the agreement to settle the territorial limits and jurisdiction must mean, by territorial limits, sovereignty, and by jurisdiction something less. It is suggested that jurisdiction is used in a broader sense in the second article, and that may be true so far as concerns Bedlow's and Ellis islands. But the provision there is that New York shall retain its `present' jurisdiction over them, and would seem on its face simply to be intended to preserve the status quo ante, whatever it may be.
"Throughout nearly all the articles of the agreement, other than those in controversy, the word `jurisdiction' obviously is used in a more limited sense. The word has occurred in other cases where a river was a boundary, and in the Virginia compact was held to mean, primarily at least, jurisdictio, — authority to apply the law to the acts of men. Wedding v. Meyler,192 U.S. 573, 584; 24 S.Ct. 322; 48 L.Ed. 570, 575; 66 L.R.A. 833.
Whether, in the case at bar, some power of police regulation also was conferred upon New York, as held in Ferguson v. Ross, need not be decided now. * * *"
The opinion concludes as follows: "* * * Without going into all the details that have been mentioned in the careful and satisfactory discussion of the question in the state courts, we are of the opinion that the land in question is subject to the sovereignty of the State of New Jersey, and that the exclusive jurisdiction given to the State of New York does not exclude the right of the sovereign power to tax."
In the case of People v. Central Railroad Company of NewJersey, 42 N.Y. 283, the New York Supreme Court of Appeals said:
"Confessedly, vessels afloat upon the waters of the bay or the river are, and were intended to be subject to the exclusive jurisdiction of New York; but whenever they were fastened to any wharf or dock upon the New Jersey shore, or were aground upon said shore, they became attached to the soil of New Jersey, and were under her exclusive jurisdiction.
"The moment they became thus affixed to the land of New Jersey in the bed of the river or on the shore, the jurisdiction *Page 101 
of New York over them was to cease, except in the language of said proviso: `They shall be subject to the quarantine or health laws, in relation to passengers, of New York.'"
"This exception explains the object and nature of the jurisdiction intended to be given to New York. It was to be a police jurisdiction of and over all vessels, ships, boats or craft of every kind that did or might float upon the surface of said waters, and over all the elements and agents or instruments of commerce, while the same were afloat in or upon the waters of said bay and river for quarantine and health purposes, and to secure the observance of all the rules and regulations for the protection of passengers and property, and all fit governmental control designed to secure the interests of trade and commerce in said port of New York, and preserve thereupon the public peace.
"By this exception, it was designed that vessels afloat upon said bay and river should not escape or evade the quarantine laws, and the laws relating to passengers of New York, by coming to anchor on or near the New Jersey shore, or by becoming attached to the wharves or docks on said shore or adjacent thereto, but in all other particulars they were left subject to the laws of New Jersey. * * *
"The remaining articles of said agreement, all fairly considered, conduce to the same construction, and confirm the view that the jurisdiction conferred upon this state over the waters of said river and bay was a qualified and limited jurisdiction conferred for police and sanitary purposes, and to promote the interests of commerce in the use and navigation of said waters, and was not designed to confer or create control over the lands or domains of New Jersey, or to give to this state any right to interfere with her complete political or governmental jurisdiction as a sovereign state of and over her own soil, and its appurtenances, and of and over every description of property of any appreciable value within her territorial limits."
In the case of Ferguson v. Ross, 126 N.Y. 459;27 N.E. Rep. 954, which was a suit for a penalty, the court said: "* * * The case of People v. [Central] Railroad [of New Jersey],42 N.Y. 283, furnishes a satisfactory answer to this objection. By the compact entered into between New York *Page 102 
and New Jersey [in 1833], the particulars of which are set forth in the opinion in that case, the middle of the North River was declared to be the boundary between the two states; but by the third article exclusive jurisdiction of and over all the waters of the Bay of New York and of the Hudson River lying west of Manhattan island and to the south of Spuyten Duyvel creek, and of and over the lands covered by said waters to low-water mark on the New Jersey side thereof, was ceded to the State of New York, reserving to the State of New Jersey jurisdiction of wharves, docks, and piers on the Jersey shore. The purpose of vesting exclusive jurisdiction over these waters in the State of New York was to promote the interests of commerce and navigation, which would, as supposed, be best subserved by giving to this state the exclusive control and regulation of the waters of the bay and harbor of New York."
The ultimate disposition of the case, however, turned upon the determination that the statute in question was not violative of the New York constitution. The value of this citation, it seems to me, lies in the fact that it is indicative of the trend of the New York courts to limit the rights of that state, under the compact, to a restricted police power, primarily in the interests of commerce and navigation.
It seems to me that in the case of Carlin v. New York DockCo., 135 App. Div. 876; 120 N.Y.S. 261, which was decided by a vote of three to two, the court went out of its way when it said that the State of New York had jurisdiction of the locus in quo
and that if New York had jurisdiction of the waters for the purposes of commerce and navigation, its legislature had power to create a cause of action in favor of the next of kin of one negligently killed by vessels navigating in such waters. That statement of the court does not seem to be in accord with the settled policy of the New York courts. The New York courts in the other cases have been reluctant to extend the extra-territorial jurisdiction beyond the apparent intention of the treaty as will appear by a study of the cases above cited, to wit, People v.Central Railroad Company of New Jersey, supra; Ferguson v.Ross, supra, and Clarke v. Ackerman, infra.
In Clarke v. Ackerman, 243 App. Div. 446; 278 N.Y.S. *Page 103 75, 78, an action in tort was dealt with which arose out of a traffic accident on the George Washington Bridge. In that case, after discussing the provisions of the treaty and cases bearing thereon, the court said as follows: "There was never any intention on the part of New Jersey to give up its prerogatives of sovereignty or any of the territory granted it by the treaty." (Citing People v. Central Railroad Co., Ferguson v. Ross
and Central Railroad Company of New Jersey v. Jersey City,supra.)
Upon a careful reading and consideration of the language of the treaty and the cases cited, I have reached the conclusion that the extra-territorial jurisdiction yielded to the State of New York by article III of said treaty was nothing more than a police power under which that state could protect and advance the interests of its port. The operation of that extra-territorial right was intended to be restricted to matters affecting health, commerce and safe navigation. I am unable to read into the treaty any intention on the part of New Jersey to give to the State of New York the right to create a cause of action for a tort which is committed west of the center line of the river; that is, the territorial limits of New Jersey defined by article I, notwithstanding the language contained in Carlin v. New YorkDock Co., supra. A proper interpretation of the language used in that case is that the court failed to appreciate the real purport of the decisions in People v. Central Railroad of New Jersey
and Ferguson v. Ross, supra. I am of the opinion that the court was wrong when it said that the police power given to New York allowed the legislature of that state the right to create a cause of action for an act occurring in this state.
Appellant also contends that the wording of paragraph 19 of the complaint filed in the United States District Court clearly indicates that the suit was brought under the New York Death Act and that distribution should be made in accordance with the law of the State of New York. It seems to me that this contention is immaterial in view of the views above expressed.
I have, therefore, concluded that the decree of the Orphans Court should be affirmed for the reasons herein expressed. *Page 104