Peter J. McQuirlan, J.
Each defendant has been indicted for the Class A felony of criminally selling a dangerous drug in the first degree and related crimes. In addition, the defendants Junco and Ruggiero have been indicted for the Class A felony of attempted murder of a police officer and related crimes.
Each defendant, claiming to be aggrieved by an unlawful search and seizure and having reasonable grounds to believe that property claimed to have been unlawfully obtained may be used against him, moves for the suppression of its use as evidence. A three-day pretrial suppression hearing was conducted and concluded.
In making a motion to suppress physical evidence, defendants bear the ultimate burden of proving that the evidence should not be used against them. The People, however, must show that the police conduct was reasonable. While the defendants have the burden of proving the illegality of the search and *75 seizure, the People are nevertheless put to the burden of going forward to show the legality of the police conduct in the first instance. Thus, the People must show that the search was made as an incident to a lawful arrest.
I find that the People have sustained their burden, and that each defendant has failed in his burden of proving an illegal search and seizure. The People at the hearing presented clear and convincing evidence that there was probable cause not only for the arrest of each defendant, but just as obviously, there was probable cause to search the vehicle in issue and seize therefrom dangerous drugs and weapons. Nothing that the arresting officers did, or failed to do, subsequent to this search and seizure nullifies or affects its constitutional validity.
PINDIN" GS OF FACT
In the early part of June, 1971, a reliable confidential informant, known as the Baron, told police officers assigned to the Special Investigations Unit (SIU), Narcotics Division, New York City Police Department, that a person known as “ Jimmy ” could connect him with a New Jersey resident capable of selling “ kilo loads ” of narcotics. Information provided by the Baron in the past had resulted in numerous convictions. Investigation of the Baron’s newly reported lead readily revealed “ Jimmy ” to be the defendant James Walls, a New York resident.
On June 24, the Baron met briefly with Walls at about 6:00 p.m. in New York County. They agreed to meet again that night. The second meeting occurred two hours later on 9th Avenue near 34th Street. Present at this second meeting were the Baron, Walls, and the two defendants Junco and Ruggiero. Each meeting was observed by SIU officers. Junco and Ruggiero, both of whom are New Jersey residents, drove away from the meeting in a blue Cadillac, and were discreetly followed by SIU officers to an automobile repair shop in Weehawken, New Jersey. The Baron was to meet again the next night with the three defendants and introduce them to a prospective buyer.
Several SIU officers conferred at the Church Street Federal Building with Frederick W. Ford, Group Supervisor, Bureau of Narcotics and Dangerous Drugs (BNDD), United States Department of Justice. Agent Ford, with 13 years’ experience in Federal law enforcement, agreed to act in an undercover capacity. He was to be introduced to the three defendants by the Baron as a large-scale buyer of narcotics. The BNDD furnished Agent Ford with $60,000 in cash to be used as 1‘ flash *76 money”; i,e., Ms mission was, if necessary, to display the money to the defendants to demonstrate his capability of making kilo purchases, and also to assure himself that the defendants were actually in possession of a large quantity of narcotic drugs.
On June 25, Agent Ford met the Baron at about 8:00 p.m. on 9th Avenue near 23rd Street. From there they proceeded in the Baron’s veMcle to 9th Avenue between 33rd and 34th Streets. At this location, the Baron introduced Agent Ford to the three defendants as an interested buyer of drugs. During the course of a one-hour meeting, the sale of “ kilo loads ” of narcotics was discussed. Three other males, who did not directly participate in the parley, were in the immediate vicinity. Three unidentified males, characterized by one witness as apparent bodyguards, arrived at the location in a vehicle registered in Junco’s name.
The details of a multiple-Hlo sale of narcotics were not completely agreed upon by the participants. Instead, a subsequent meeting between Ford and the defendants was to be arranged. Agent Ford and the Baron drove from the location in the latter’s vehicle. The meeting was observed by SIU officers. After Ford and the Baron left, the three defendants clapped hands and danced in an apparently joyful manner.
On June 28, Agent Ford again met the Baron on 9th Avenue near 23rd Street. They proceeded to 9th Avenue between 33rd and 34th Streets, arriving there at about 8:00 p.m. Concealed on Agent Ford’s person was a radio transmitter. A number of BNDD agents and SIU officers were in the immediate vicinity. The agents and officers were strategically placed; for example, one officer, operating a police-owned yellow taxi, double-parked this decoy cab a short distance north of 33rd Street, with the meter running. The agents and officers were in radio communication with each other. In addition, a prearranged hand signal was to be used by Agent Ford.
At about 8:15 p.m., the three defendants arrived at the meeting site in a red convertible. Agent Ford questioned Ruggiero about the narcotics. The latter replied that he could get the narcotics from another car. Ruggiero asked Ford if he had the money. Ford replied that the money was in another car. Further negotiations followed until a purchase price of $54,000 was agreed upon. Ruggiero then told Junco and Walls to get the narcotics and return. The latter two left in the red convertible" and, with Junco driving, it turned west on 33rd Street, *77 An entrance to the Lincoln Tunnel is on this street between 9th and 10th Avenues.
Agent Ford and the Baron waited with Ruggiero on the sidewalk until about 9:55 p.m. when Junco and Walls returned in the red convertible, with Junco still driving. Walls left the vehicle, approached Ford and Ruggiero, and said “ It’s in the car ”. Junco and Ruggiero told Ford to enter the convertible. Ruggiero got into the back, and Ford sat in the front passenger seat. Walls and the Baron remained on the sidewalk. With Junco driving, the convertible proceeded south on 9th Avenue, turned right on 33rd Street, and parked a short distance west of 9th Avenue.
Ruggiero then reached down behind the back seat and removed a large paper bag. He passed it over the front seat to Agent Ford for his inspection. The lighting in the area was sufficient for the latter to look into the bag and observe cellophane packages containing a white powder which in his opinion, as an expert in narcotics law enforcement, constituted a large quantity of dangerous drugs. Agent Ford, leaving the paper bag and its contents in the convertible, told Junco and Ruggiero to remain in the car; that he was going to another vehicle to get the money.
Agent Ford walked to 9th Avenue and 33rd Street and gave the prearranged hand sign, as well as a radio transmission, signifying that narcotics were in the red convertible and that the three defendants should be immediately arrested. Ford’s signals were seen and heard by the SIU officers.
Defendant Walls was promptly seized near his vehicle. As the decoy taxi was about to approach the other two defendants, the motor unexpectedly stalled, and the red convertible occupied by Junco and Ruggiero began to move west. Detective Hubert Erwin, armed with a double-barreled shotgun, jumped from another police vehicle that was momentarily blocked by the disabled cab, and ran toward the red convertible with his police shield displayed. When Erwin was near the convertible, a shotgun barrel was protruded from the passenger side of the escaping convertible and a blast was fired from this deadly weapon.
The convertible proceeded west on 33rd Street a short distance to the Lincoln Tunnel entrance. Detective Erwin continued running to the tunnel entrance. There he signaled to a police vehicle operated by Lieutenant John J. Hill and Sergeant Norman Cohen, SIU supervisors, that the fleeing convertible had entered the tunnel. The two supervisors turned into the *78 tunnel. Detective Erwin commandeered a private vehicle and began his pursuit. In the meantime, Detective James Sheridan had started the decoy cab and also joined in the chase. Sheridan explained the emergency situation to a Port Authority (P.A.) patrolman at the east end of the tunnel and requested him to immediately notify P.A. officers at the opposite end to stop all westbound traffic. Within moments, all vehicular traffic was halted by P.A. police at the west end. The red convertible was stopped approximately three car lengths from the tunnel’s west mouth.
Junco and Ruggiero were seized in the convertible by SIU officers. Physical force was used to effect the arrest of Ruggiero, who was holding a shotgun when the officers approached the convertible. After the two defendants were taken from the vehicle, Lieutenant Hill removed the shotgun and a pistol from the front, and a large quantity of dangerous drugs from the rear. (These are the principal items that the defendants now seek to suppress.)
Port of New York Authority police officers were at the scene. A serious traffic jam was produced by the chase and capture. Junco and Ruggiero were brought to an alcove within the tunnel itself at the west end, and then immediately transported eastward to the 14th Precinct in New York County, and thereafter to Manhattan Criminal Court for arraignment.
CONCLUSIONS OF LAW
On the date defendants were arrested, the then applicable Code of Criminal Procedure (§ 177; see new CPL 140.10, subd. 1) provided that a police officer could arrest a person without a warrant when he had reasonable cause for believing that a felony had been committed and that the person arrested had committed it. The credible evidence in this case is overwhelmingly abundant that there was probable cause not only for the arrest of each defendant, but just as obviously there was probable cause to search the red convertible for dangerous drugs and weapons.
At the moment when each defendant was arrested, the facts and circumstances known to the police officers were more than sufficient to warrant a prudent man in believing that the defendants had committed a felony. Not only did the police officers have probable cause to search the red convertible, but the search was contemporaneous with the arrest of Junco and Ruggiero and confined to the immediate vicinity of the arrest. The warrantless seizure of the evidence in this case was constitutionally valid.
*79 The defendants’ principal argument, although tortuous, may be summarized as follows: Junco and Ruggiero were arrested at a point within the Lincoln Tunnel that is immediately beneath the land mass of New Jersey; it is legally irrelevant to this suppression motion that the Lincoln Tunnel is an enclave within the jurisdiction of an autonomous bi-State agency created by interstate compact; at the moment of arrest, the SIU officers were in fact acting extraterritorially; the New Jersey Fresh Pursuit Law requires that a fleeing felon, who is arrested by his pursuers at any point within that State, must be brought before a New Jersey Magistrate for extradition proceedings; the SIU officers brought both defendants before a New York City Criminal Court Judge for arraignment instead of before a New Jersey Magistrate for extradition; since the post-arrest procedures prescribed in the New Jersey Fresh Pursuit Law were not followed, the validity of the arrests by the SIU officers must be judged by the arrest standards applicable to private persons; in New York or New Jersey a private person may arrest without a warrant for a felony only if it was in fact committed; while evidence illegally seized by private persons is ordinarily admissible at a criminal trial, the arrests of Junco and Ruggiero by SIU officers do constitute State action so as to bring into play the full panoply of the exclusionary rules; since these arrests are deemed made by a private person, their lawfulness can be determined only after a trial of Junco and Ruggiero ; but the dangerous drugs and weapons seized in this case are inadmissible at such trial because only after a trial can it be determined whether the arrests and incidental search were reasonable; ergo, all physical evidence must be suppressed. Additionally, all defendants urge the court to promptly dismiss the Class A drug indictment since, to quote them, ‘1 a narcotics conviction cannot be gotten in the absence of the physical evidence.”
Defendants’ argument is neither sound logic nor good law. Metaphorically, defendants seek to resurrect and mold to their plight some form of the ancient but long-dead right of sanctuary. But the Lincoln Tunnel is simply not a sanctified Fourth Century place of .refuge that accords absolute immunity to a retreating rogue whenever he breathlessly crosses some undescribed goal line in this subaqueous tube. Thus, a fleeing felon captured within the tube will not be furnished perpetual refuge from prosecution similar to the immunity recognized by Theodosius or Tiberius when a scampering criminal reached a recognized sanctuary a few rods ahead of his pursuers.
*80 The Port of New York Authority, an autonomous bi-State agency, was created in 1921 by designated representatives of New York and New Jersey acting under the compact clause of the Federal Constitution (L. 1921, ch. 154, § 1). It is empowered to construct and operate transportation and other facilities of commerce within the port district. The latter term is defined by law. Port Authority projects are financed with the issuance of its own bonds. The Lincoln Tunnel is one of six bridge and tunnel facilities under its jurisdiction. It maintains its own very large police force. Members of this bi-State police department— designated as police officers under New York law — patrol, for example, the Lincoln Tunnel and the extensive plaza areas at both ends of this tunnel that are within the Port Authority enclave.
The boundary line between New York and New Jersey was established by chapter 8 of the Laws of 1834. Opposite New York County the boundary is the center of the Hudson River, except that offenses committed anywhere on this river “ southward of the northern boundary of the city of New York * * * shall so far be deemed within the jurisdiction of the city of New York that all offenses committed thereon shall be cognizable in the courts of criminal jurisdiction held in and for all the respective boroughs of such city, which border upon such [River] ” (Code Grim. Pro., § 136-a; see CPL 20.40, subd. 4, par. [d]).
The New Jersey Fresh Pursuit Law provides that any police officer “ of another state of the United States who enters this state in fresh pursuit, and continues within this state in such fresh pursuit, of a person in order to arrest him on the ground that he is believed to have committed a felony in such other state,” shall have the same authority to arrest as has any New Jersey police officer (N. J. Stat., § 2A:155-4). It also provides that if “an arrest is made in this state by an officer of another state in accordance with the [aforesaid] provisions, he shall, without unnecessary delay, take the person arrested before a neighboring magistrate, who shall conduct a hearing for the purpose of determining the lawfulness of the arrest. If the magistrate determines that the arrest was lawful he shall commit the person arrested to await for a reasonable time the issuance of an extradition warrant by the governor of this state or admit him to bail for such purpose. If the magistrate determines that the arrest was unlawful he shall discharge the person arrested ” (N. J. Stat., § 2A:155-5).
*81 There is no necessity for this court to expressly find that the New Jersey Fresh Pursuit Law applies to that place within the Lincoln Tunnel where the arrests of Junco and Ruggiero were effected. While the Fourth Amendment should receive a liberal construction, a close pursuit law need not be strictly construed. Its provisions should be construed according to the fair import of its terms to promote justice and effect the objects of the law. There is no evidence that the draftsmen of the Uniform Close Pursuit Act (CPL 140.55; 140.10, subd. 3) intended to impose “strict liability” on pursuing police officers who in fact enter a contiguous State but, because of compelling attendant circumstances, are justifiably unaware of such intrusion.
A close pursuit law should be construed as requiring the chasing police officer to know — or by the exercise of reasonable diligence should know — that he has entered and is continuing his pursuit within the sovereign jurisdiction of a foreign State. Police officers in pursuit of a fleeing felon are not required to carry topographic maps, a transit, subtense bars, steel tapes and related surveying equipment. Defendants’ position on the law would lead them to argue that where a New York police officer, in possession of ample probable cause, chases in hot pursuit a fleeing narcotics trafficker through a heavily wooded area, captures him, conducts an incidental search, and promptly arraigns him before a New York criminal court, that arrest and search are a nullity if, months later, a land survey incontestably shows that the arrest was made within New Jersey, a trifling distance beyond the State boundary, and it matters not, the defendants might say, that the police officer did not lmow or have any grounds to believe that he entered New Jersey territory. This “ absolute liability ” argument is absurd.
In New York, a supertechnical jurisdictional objection — analogous to the one urged by defendants — concerning offenses committed near boundaries, on board moving trains, vessels or aircraft, upon bridges, or in tunnels, has only a minimal chance for success (see CPL 20.40, subd. 4).
I find that the SIU officers had absolutely no basis for knowing or believing that they had entered and continued their pursuit within the territorial jurisdiction of New Jersey. Even lawyers may be uncertain as to where the jurisdiction of New York ends, and that of New Jersey begins, at a Port Authority Hudson River crossing (see, e.g., Bunge v. C & N Truck Leasing, 69 Misc 2d 143; Clarke v. Ackerman, 243 App. Div. 446).
*82 At the core of the Fourth Amendment is the security of one’s privacy against arbitrary intrusion by the police. The purpose for the exclusionary rule is to deter unconscionable invasions of privacy by the police: to compel respect for the constitutional guarantee by removing the incentive to disregard it. But neither precedent, the rationale for the exclusionary rule, nor reason requires the suppression of evidence seized as an incident to a valid close pursuit arrest at an inconsequential distance from an undescribed New York-New Jersey boundary line, simply because the pursuing police officers were understandably unaware that the arrest occurred at a place within the territorial jurisdiction of New Jersey, and therefore unintentionally failed to take the arrested person before a New Jersey Magistrate, but did take such person without unnecessary delay before a New York Magistrate.
This is not a case where Junco and Ruggiero successfully exited the tunnel, and sped a substantial distance beyond the Port Authority jurisdiction; they were not chased through Weehawken, Hoboken or Secaucus; they did not traverse the New Jersey Turnpike or cross the Hackensack River. This is not a case where defendants were abducted back to New York in a manner that offends decency or the concept of due process (cf. Frisbie v. Collins, 342 U. S. 519; Scott, Criminal Jurisdiction of a State over a Defendant Based upon Presence Secured by Force or Fraud, 37 Minn. L. Rev. 91), nor is it a case where the SIU officers knowingly, intentionally, recklessly or negligently violated any applicable State law. In brief, this is not a case where “the constable has blundered ”.
I will assume, only for purposes of argument and without so finding, that the New Jersey Fresh Pursuit Law did in fact require that Junco and Ruggiero be brought before a “neighboring magistrate ”, and that the SIU officers knew or should have known of this foreign statutory mandate. Defendants then argue that, at the moment of arrest, the occurrence of a “condition subsequent” (i.e., production of defendants before a “neighboring magistrate”) was necessary to legalize the police action, and since this condition never happened, the arrest and concomitant seizure are constitutionally unlawful. No authority or reason is cited for this exotic assertion. It is horn-book law that the lawfulness of an arrest or an incidental search is determined at the moment it is made. What a police officer finds or does or fails to do after the arrest is irrelevant to the issue of its constitutional validity.
*83 If there was a violation of the “neighboring magistrate” requirement in the New Jersey Fresh Pursuit Law by the SIU officers in this case, I find that it was insignificant and piddling, did not affect or prejudice the defendants ’ rights, and was harmless beyond a reasonable doubt. Neither statutory nor judicial authority supports the argument that a technical noncompliance with the post-arrest procedure prescribed in the Uniform Close Pursuit Act voids an otherwise perfectly valid probable cause arrest, or calls for the invocation of the exclusionary rule.
Defendants’ arguments insult the common sense standard of reasonableness governing search and seizure cases. “ A fertile source of perversion in constitutional theory is the tyranny of labels. Out of the vague precepts of the Fourteenth Amendment a court frames a rule which is general in form, though it has been wrought under the pressure of particular situations. Forthwith, another situation is placed under the rule because it is fitted to the words, though related faintly, if at all, to the reasons that brought the rule into existence ” (Cardozo, J., Snyder v. Massachusetts, 291 U. S. 97, 114). By no possible stretch of the legal imagination can the arrests of the three defendants and the contemporaneous search be faulted. Defendants are urging an unprecedented and bizarre application of the exclusionary .rule. Nothing that the police did in this case can be said to remotely offend those values that are at the core of the Fourth Amendment.
The defendants ’ motion is denied in all respects.