Docket No. 103845.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JESSE
GALAN, Appellee.

*Opinion filed July 24, 2008.*

JUSTICE GARMAN delivered the judgment of the court, with
opinion.

Chief Justice Thomas and Justices Fitzgerald and Karmeier
concurred in the judgment and opinion.

Justice Burke specially concurred, with opinion.

Justices Freeman dissented, with opinion, joined by Justice
Kilbride.

## OPINION

In November 2001, defendant, Jesse Galan, was indicted for
possession with intent to deliver 900 or more grams of cocaine and
more than 5000 grams of cannabis. The evidence against him was
suppressed by the circuit court of Cook County and the State filed a
"Certificate of Substantial Impairment" and brought an interlocutory
appeal pursuant to Supreme Court Rule 604(a)(1) (210 Ill. 2d R.
604(a)(1)). The appellate court affirmed. 367 Ill. App. 3d 876. After
its petition for rehearing was denied, the State filed and was granted

leave to appeal to this court pursuant to Supreme Court Rule 315 (210 Ill. 2d R. 315).

There are two issues in this case: first, whether Illinois courts must inquire into extradition irregularities for crimes committed within Illinois' borders; and, second, whether exclusion is the appropriate remedy when Illinois police violate a postarrest provision of another state's fresh pursuit statute. We reverse.

## BACKGROUND

On October 11, 2001, defendant drove his truck onto the Chicago Skyway, entering the Skyway from an Illinois on-ramp. After continuing onto a tollbooth 0.8 miles into Indiana, defendant was stopped by several Chicago police officers. Defendant's vehicle was searched, and police recovered two boxes filled with marijuana. Defendant was arrested and taken to his mother's house at 8521 South Burley Avenue in Chicago, where he sometimes resided. Police conducted a search of the house in the presence of defendant and his mother and stepfather, eventually recovering two pistols, approximately $10,000 in cash, and cocaine. A probable cause hearing was held and defendant was eventually indicted by a Cook County grand jury, as indicated above.

Prior to trial, defendant filed a motion to quash arrest and suppress evidence. The motion was filed on July 23, 2002, and requested the trial court to "[q]uash [defendant's] arrest, because of the absence of authority of probable cause to effect it, and to suppress from introduction into evidence in this cause, the following: (a) Physical evidence discovered and as a result of arrest and detention; (b) Statements, utterances, reports of gestures and responses by petitioner during the detention following the arrest[ ] i.e. oral statements of defendant[;] (c) All other knowledge and fruits thereof, witnesses statements, whether written, or oral or gestural and products of the arrest." Defendant asserted that during his arrest and subsequent detention, the State "became aware of the existence of physical evidence all the direct and indirect fruits of the arrest and detention, which connect petitioner with the instant offense." The trial court conducted an evidentiary hearing on September 17, 2003.

Defendant testified that he was driving his truck toward Indiana when he was stopped at the tollbooth, past the "mile 1" marker located in Indiana. He stated that several men dressed in plain clothes, who it soon became apparent were Chicago police officers, approached him at the tollbooth with guns drawn and ordered him out of his truck, placed him in handcuffs, and forced him onto the ground. Defendant testified that he did not give the men permission to search his truck. Defendant acknowledged that when the truck was searched, police recovered two boxes of marijuana and told him he was under arrest.

Defendant testified that the police then took him back to his mother's house in Illinois. He stated that he occasionally resided at his mother's house and had come from that address when he was stopped at the tollbooth. Defendant testified that officers knocked on the door of his mother's house and asked him if they could search the house. Defendant testified that he told the officers they could not search the house. He also testified, though, that his mother eventually opened the door and, upon learning that the police had "busted [defendant] with some marijuana," agreed, after being asked, to allow the officers to search the home. Defendant maintained that while he later signed a consent to search, he only did so after officers threatened to arrest his mother and stepfather. Defendant acknowledged that in searching the house, police found other contraband. He asserted, however, that this contraband was found before he signed the consent to search.

On cross-examination, defendant testified that after he was removed from his truck by the police, the officers moved him away from traffic and told him he was under arrest. Defendant stated that at this point officers began searching his truck and found the two boxes containing marijuana in the truck's backseat. Defendant testified that the officers eventually informed him that he was in trouble and they were planning to take him back to the house he had come from, which he understood to be his mother's house. Following this testimony, defendant answered several more questions regarding the circumstances surrounding the search of his mother's home.

The State called Officer Brian Luce, one of the Chicago police officers involved in arresting defendant. Luce testified that he was part of the Chicago police department's narcotics and gangs investigation section. Luce stated that after obtaining information from a

confidential informant, police became interested in defendant. This informant indicated that defendant lived at 8521 South Burley Avenue and 9735 Avenue M in Chicago. Moreover, the informant stated that defendant was storing, selling, and manufacturing large quantities of marijuana. Based on this information, the Chicago police department began an investigation, in which Luce took part.

Luce testified that on October 11, 2001, he was conducting surveillance on the Avenue M address as part of the ongoing investigation. Luce indicated that other officers were conducting surveillance on the Burley Avenue address. Luce observed defendant and another individual, Jose Mojica, leave the Avenue M address and drive to the Burley Avenue address in defendant's truck. Luce saw defendant and Mojica get out of the truck and enter the house at 8521 South Burley. At this point, Luce picked a surveillance spot around the block while another officer set up surveillance on the front door. Luce then received a radio communication from the other officer that defendant and Mojica, who was carrying a white bag, left the house, got back in the truck, and headed back to the Avenue M address.

Luce followed the men back to the Avenue M address and observed Mojica, still carrying the white bag, exit the truck and get into a Nissan Maxima by himself. At this point, part of the surveillance team, including Luce, followed the Nissan, while another part of the surveillance team remained at the Avenue M address. Eventually, a marked police car pulled Mojica over and Luce was informed by radio that Mojica did not have a valid driver's license and was going to be taken to a police station for a traffic violator bond. Luce further testified that the beige Maxima was taken to the police station, where a custodial search was performed and the white bag, the same bag that was observed going into the car, was found to contain a large amount of currency.

After being informed that Mojica was in custody and a large amount of currency was found, Luce was told to go back to Avenue M and continue surveillance. Luce observed defendant again leave the Avenue M address and return to the Burley Avenue address. Luce testified that another officer saw defendant enter the house and then exit, carrying a brown box. Luce testified that the other officer told him that while taking the box to his truck, defendant was looking up and down the street. Defendant then repeated this action, entering the

house, leaving with a second brown box, and taking it to his truck, nervously looking up and down the street.

Luce stated that after defendant entered the truck he pulled away, only to stop approximately 50 to 100 feet from the Burley Avenue address and look up and down the street, watching the cars as they passed. Luce, who was then following defendant, had to drive by in his unmarked vehicle. In driving by, Luce observed defendant looking out his driver's side window in several different directions. Luce testified that based upon his experience as a Chicago police officer, defendant's actions constituted countersurveillance or tactics used to see if police are in the area.

After driving by defendant, Luce drove around the block and was informed over the radio that defendant made an illegal U-turn, crossing two lanes. Luce was eventually able to reposition himself behind defendant's truck. Luce testified that officers continued "moving surveillance" and observed defendant travel from Burley Avenue to Indianapolis Boulevard and then onto 106th Street, where he veered from the far left to the far right lane, without signaling, across three or four lanes of traffic, traveling to the Skyway on-ramp. Luce stated that defendant's "erratic move from the left [lane] all the way to the right [lane]" led police to believe that their surveillance was compromised. Again, Luce and other officers believed that defendant's conduct indicated that he was either trying to get away or utilizing countersurveillance tactics to see if he was being followed. At that point, Luce and the other officers agreed to stop defendant's vehicle to investigate.

Luce testified that officers stopped defendant's truck "right at the tollbooth" and quickly ran up to the car with guns drawn. Once it was safe, the officers holstered their guns. Luce stated that when he approached the vehicle and opened the passenger door, he smelled a strong odor of cannabis. Luce testified that he had smelled this odor before while carrying out his duties as a Chicago police officer and it was not easily confused with any other smell. Luce testified that officers asked defendant what was in the boxes and he answered that it was "weed," a street term for cannabis, and asked if he was in trouble. Moreover, defendant stated that he believed there was 20 pounds of cannabis in the boxes. Luce stated that officers then took defendant out of the truck, pulled it to the side of the highway, and

began talking to defendant. During that conversation, officers told defendant what they had seen that day, informed him that he was under arrest, and advised him of his rights.

After reading defendant his rights, Luce continued speaking with defendant, informing him of the ongoing investigation, noting that they had found the cannabis and indicating that they wished to search defendant's home. Officers then brought defendant back to the Burley Avenue address and, Luce testified, defendant agreed to sign a consent-to-search form. Luce testified that he did not physically threaten defendant or act abusive toward him and defendant simply signed the form in the presence of another officer. Luce further testified that he signed the consent-to-search form. Moreover, he stated that the form was signed before the house was searched. Luce testified that defendant was cooperative, appeared to be nervous, and wanted to work with police.

Luce testified that officers then conducted a search of the residence, in the presence of defendant's mother and stepfather. As already noted, they recovered two pistols, approximately $10,000 in cash, and cocaine. Additionally, Luce testified that police found an envelope addressed to defendant at 8521 South Burley Avenue. Moreover, Luce stated that he did not make any threats to defendant regarding his parents, nor did he threaten defendant's parents with arrest in order to gain more cooperation from defendant.

Before the State finished its questioning, Luce testified to one last matter regarding Mojica. Luce testified that he was informed by other officers that when Mojica was stopped and police found him in possession of around $80,000, Mojica lied regarding its origins. Mojica stated that the money was brought to him at a location that officers, based upon their surveillance, knew not to be true. Luce testified, as he had previously, that officers observed Mojica retrieve a white bag from the Burley Avenue address, take that bag to the Avenue M address, exit defendant's truck with the bag, and then get into the Nissan Maxima with the bag. Surveillance never lost sight of the vehicle or Mojica, and when Mojica was stopped, the bag containing the currency was recovered.

On cross-examination, Luce acknowledged that the informant police relied upon in this case was unknown to him. Additionally, Luce did not know and his report did not indicate that the informant

ever saw narcotics inside 8521 South Burley Avenue. Moreover, Luce did not know if the informant, described as a confidential informant, had ever been used in prior cases and Luce's report did not indicate that the informant was reliable. Luce testified, though, that surveillance was set up based upon the information from this informant.

Luce acknowledged that no one saw where the bag containing currency came from or who gave it to Mojica, merely that Mojica came out of the South Burley Avenue address carrying it. Additionally, Luce admitted that neither he nor any other officers could see through the bag. Moreover, Luce testified that when Mojica was stopped while driving the Nissan Maxima, he was stopped not for any traffic violation or the commission of any crime, but because officers believed that he had something to do with their narcotics surveillance. Essentially, Mojica was stopped solely to see if there were drugs in the bag. While money was eventually found, no narcotics were found in the car, nor was it known, at the time of the stop, that Mojica was operating the car without a valid driver's license. Additionally, Luce testified that Mojica never told officers that there were narcotics inside the Burley Avenue address, never told officers that he got the money from the Burley Avenue address or from defendant, and never told officers that the money constituted the proceeds of narcotics.

Luce testified further on cross-examination that he could not see what was in the boxes defendant brought from 8521 South Burley Avenue to his truck. Moreover, Luce acknowledged that defendant's activity of pulling his truck over and looking in his mirrors could be construed as normal activity. Regarding the eventual stop of defendant at the tollbooth, Luce stated that while he believed it occurred in Illinois, he was not certain and it could have been in Indiana. He also stated that the stop was not carried out to give defendant a traffic ticket but was actually carried out because of Luce's belief that surveillance was compromised and officers were conducting a drug investigation.

Luce testified that while he could smell cannabis when he approached defendant's truck, he did not actually see the cannabis until he opened the boxes inside the truck. Luce testified that the boxes were opened without obtaining defendant's consent. Moreover,

Luce stated that before he opened the boxes, and even before he read defendant his rights, he asked defendant what was inside. Luce also testified, though, that before asking defendant what was in the boxes he told defendant that the police were pulling him over because they believed that a narcotics transaction occurred.

On cross-examination, the defense asked several questions and Luce testified extensively regarding the eventual search of the Burley Avenue address. This testimony was unaltered from Luce's testimony regarding the home search on direct examination. Luce stated that officers brought defendant back to the Burley Avenue address, explained the consent-to-search form to defendant, one of the officers read the form to defendant, Officer Luce filled out the form, and then defendant signed it. Luce testified that he and the officers did not immediately knock on the front door of 8521 South Burley Avenue upon arriving, instead waiting until after defendant had already signed the consent-to-search form.

The parties stipulated to the testimony of another officer who took part in the investigation. Detective Schnoor would have testified that he saw the boxes that were eventually found to contain cannabis being taken out of 8521 South Burley Avenue one at a time by defendant. Moreover, he would have testified that in taking those boxes out defendant looked up and down the street, conduct which he believed indicative of people transporting narcotics. It was also stipulated, however, that this type of behavior could be seen in law-abiding citizens as well.

On October 1, 2003, the motion to quash and suppress came up for argument. Before argument was heard, though, the parties additionally stipulated that private investigator Joe Carone would testify he photographed the tollbooth where defendant was arrested, which was 0.8 miles from the Illinois border, inside Indiana. Defendant argued not only that the arrest at the tollbooth was improper, but also that defendant's later consent to search was involuntarily given. Defendant contended, while arguing before the trial court, that "[i]f the initial stop is bad everything that happens after that stop is bad, including the consent form, the alleged smell and the stop in the other state, all of that falls." The State, by contrast, argued that the anonymous tip, the suspicious driving between two houses multiple times in one day, the fact that $80,000 dollars was recovered from

Mojica, and defendant's conduct which officers believed to be countersurveillance, taken together, amounted to probable cause. Considering these arguments, and after making specific factual findings, the trial court agreed with the State that officers had probable cause to arrest defendant and denied defendant's motion.

On October 28, 2003, defendant filed another motion to suppress, this time specifically referring only to the evidence seized as a result of the search at defendant's residence at 8521 South Burley Avenue. No hearing was held on this motion. The motion was again presented, however, on March 8, 2004, in tandem with defendant's motion to vacate the trial court's earlier denial of defendant's motion to suppress evidence. The March 8 motion, presented in a single document, asked the trial court to enter orders: "A. Vacating the order entered October 01, 2003, denying the defendant's motion to suppress; B. Holding an evidentiary hearing on the defendant's motion to suppress the items seized from his home on October 11; C. Granting the motion to suppress the items seized from the defendant's home at 8521 South Burley, Chicago, Illinois on October 11, 2001."

On June 8, 2004, the trial court heard argument regarding defendant's March 8 motion to vacate and motion to suppress. Defendant asserted that the original motion to suppress, filed on July 23, 2002, and denied by the trial court on October 1, 2003, "concerned itself only solely and exclusively with the search of the car and [defendant's] arrest and probable cause for his arrest. It did not concern itself in any way with the search *** later that day of defendant's home." Defendant contended that the issue of the search at defendant's home had never been litigated or ruled upon. Defendant acknowledged, though, that the trial court previously denied the motion to quash and suppress with respect to the search of defendant's car and his arrest.

Supporting the new motion, defendant asserted that the arrest was illegal because it took place in Indiana. Defendant asserted that pursuant to Indiana statutory law, after Chicago police officers arrested defendant, they were required to take defendant before a judge of the Indiana county in which the arrest was made for a bond hearing. Ind. Code Ann. §35–33–3–2 (Michie 1998). Because that was not done in this case, defendant contended his arrest was invalid. Based on this argument, defendant asked the trial court to vacate the

original denial of the motion to suppress and grant the motion to suppress.

In response, the State acknowledged that defendant should have been brought before an Indiana judge for a bond hearing. The State argued, though, that the failure to do so was harmless and for the trial court "to suppress any evidence recovered by the police officers including a consent to search, including all the cannabis that was found in defendant's vehicle, including all of the evidence that was found at the address [in] Illinois is too harsh for the circumstances in this case." The State asserted that the trial court already heard all of the arguments defendant made in this motion in the previous motion, specifically noting that the trial court heard arguments about the legality of defendant's arrest in Indiana when it considered defendant's first motion to suppress. Accordingly, the State requested the trial court to again deny defendant's motion.

The trial court noted that it was undisputed that the arrest in this case took place in Indiana. The court then pointed out that Indiana was not afforded, as required by Indiana statute, the opportunity to determine whether there was probable cause for defendant's arrest. Ind. Code Ann. §35–33–3–2 (Michie 1998). Moreover, extradition procedures required by Indiana statute were not followed. Ind. Code Ann. §35–33–3–2 (Michie 1998). In light of the above, the trial court vacated its denial of the original motion to quash and suppress and granted defendant's new motion to quash and suppress the evidence in Indiana. Having done this, the court set a future date for a hearing on the motion regarding the search of the Burley Avenue address. This hearing was never held, though, as the trial court went back on the record the same day, June 8, 2004, and granted the motion to suppress with regards to the evidence obtained at the Burley Avenue address. The trial court noted that the information retrieved at 8521 South Burley Avenue resulted from the "wrongful detention in bringing [defendant] back across the state line," which was the same basis the court utilized in granting defendant's motion to vacate.

With this factual and procedural background in mind, we turn to our analysis.

ANALYSIS

In its petition for leave to appeal, the State presents two arguments. First, the State asserts that an Illinois court need not inquire into extradition irregularities for crimes committed within Illinois' borders, as such irregularities affect neither the guilt nor the innocence of the accused, nor the jurisdiction of the Illinois court to try a defendant. Second, the State contends that exclusion is not the appropriate remedy in this case. As the facts are not in dispute and these arguments present questions of law, review is *de novo*. *People v. McCarty*, 223 Ill. 2d 109, 148 (2006).

## A. Procedural Issues

Before addressing the State's arguments, we first address several procedural arguments. Defendant asserts that the State's position is essentially that an individual arrestee may not contest the validity of the arrest and postarrest procedures visited upon him. Defendant contends that this argument was not presented to the trial court by the State and thus is forfeited. *People v. O'Neal*, 104 Ill. 2d 399, 407 (1984). In a similar vein, defendant argues that the State never presented argument regarding the law of extradition in the trial court, and thus any reliance on such law is also forfeited. Additionally, defendant asserts that the State failed to argue the good-faith doctrine before the trial court or the appellate court, and, accordingly, argument on that point is forfeited as well.

The State asserts that it has sufficiently preserved its claims to survive forfeiture. First, the State argues that defendant mischaracterizes its argument. The State contends that its argument is not premised upon standing, but on the position that irregularities in extradition affect neither the guilt nor the innocence of a defendant, nor the jurisdiction of the court to try him. Defendant, in arguing before the trial court, specifically referenced the extradition clause of the United States Constitution and asserted that in this case, Chicago police officers essentially acted as "kidnappers when they took [defendant] from Indiana back in Illinois." The State also specifically referred to the extradition clause before the trial court and argued that the officers' failure to adhere to Indiana's postarrest statutory procedures was harmless and did not deprive the trial court of jurisdiction to consider the case. Like the parties, the trial court referred to the extradition clause, noting that "what was skipped in

this case was the fact that there was no extradition hearing \*\*\* we have skipped the extradition proceedings in Indiana and I feel that that is determinative in this case of the law that should be applied."

Likewise, the State claims that defendant mischaracterizes its argument regarding good faith. The State asserts that it is not arguing for a good-faith exception to the exclusionary rule. Instead, it is the State's position that the officers in this case did not intentionally ignore Indiana's statutory scheme and thus the exclusionary rule should never even be invoked. According to the State, exclusion is unwarranted in this case based upon the deterrent effect/detriment to society considerations necessary to deciding if the rule should be invoked in the first place. See, *e.g.*, *Hudson v. Michigan*, 547 U.S. 586, 591, 165 L. Ed. 2d 56, 64, 126 S. Ct. 2159, 2163 (2006) (explaining that the exclusionary rule should only be applied where its deterrence benefits outweigh its substantial social costs); *People v. Coleman*, 227 Ill. 2d 426 (2008) (where this court noted that if the main purpose of the exclusionary rule is to deter future police misconduct the interests of justice are not served by suppressing electronic surveillance gathered pursuant to federal law in contravention of state law, unless there is evidence of collusion to avoid the state law requirements). The State points out that arguments regarding good faith were presented in the trial court, the appellate court, and in the petition for leave to appeal in this court. Indeed, both the trial and appellate court referenced good faith in their decisions, with the trial court making its decision "regardless of the good faith of the officers" and the appellate court asserting that "Chicago police officers blatantly disregarded" portions of Indiana's fresh pursuit statute. 367 Ill. App. 3d at 881.

This court has considered the purpose of the forfeiture rule repeatedly, noting:

> " ' "Failure to raise issues in the trial court denies that court the opportunity to grant a new trial, if warranted. This casts a needless burden of preparing and processing appeals upon appellate counsel for the defense, the prosecution, and upon the court of review. Without a post-trial motion limiting the consideration to errors considered significant, the appeal is open-ended. Appellate counsel may comb the record for every semblance of error and raise issues on appeal whether or not

trial counsel considered them of any importance." ' " *People v. Lewis*, 223 Ill. 2d 393, 400 (2006), quoting *People v. Enoch*, 122 Ill. 2d 176, 186 (1988), quoting *People v. Caballero*, 102 Ill. 2d 23, 31-32 (1984).

It is apparent in this case that while the State's arguments regarding extradition and good faith were not as extensively made or fully developed in the lower courts as they are before this court, they were raised and considered. As such, it would not serve the purposes of the forfeiture rule to apply it under these circumstances and we will not do so.

Defendant also contends that this case involves two separate and independent searches, one of defendant's truck and one of the Burley Avenue address. Defendant asserts that the State's notice of appeal was limited to the quashing of defendant's arrest and the search of his car, and thus this court lacks the jurisdiction to determine the validity of the search of the Burley Avenue address. Defendant points out that Supreme Court Rule 604(a)(1) (210 Ill. 2d R. 604(a)(1)) provides that the State has the right to appeal from the denial of a motion to suppress and Supreme Court Rule 606 (210 Ill. 2d R. 606) provides that the filing of a notice of appeal is jurisdictional.

This case does involve two separate searches. However, this does not establish that the validity of the search at the Burley Avenue address presents a question beyond this court's jurisdiction. The record establishes that the trial court was presented with extensive evidence and testimony regarding the search at 8521 South Burley Avenue. Both parties discussed the search of the home at the evidentiary hearing and both parties referenced it in making arguments. Defendant's original motion to quash and suppress was broadly written and specifically asked that all "knowledge and fruits *** and products" of his arrest and detention be suppressed. Moreover, defendant argued that during his arrest and subsequent detention, the State "became aware of the existence of physical evidence all the direct and indirect fruits of the arrest and detention, which connect petitioner with the instant offense." The evidence found at the Burley Avenue address constitutes the fruits and products of defendant's arrest, just as it connects petitioner with the offenses charged.

The fact that defendant later filed a second motion to suppress, this time only referencing the home search, does not alter that fact that the home search was at issue and considered in the first motion to suppress. Considering this, it is not surprising that the trial court did not hold another evidentiary hearing and did not specifically consider the second motion to suppress filed on October 28, 2003, as it seems merely to constitute an attempt to revive a portion of the previously ruled upon motion. The trial court's discussion of defendant's later motion to vacate and motion to suppress, filed on March 8, 2004, supports this position. After granting the motion to vacate on June 8, 2004, the trial court initially set a later date to argue the motion to suppress. Instead of waiting until a later date, however, the trial court went back on the record that same day and granted the motion to suppress the evidence seized at 8521 South Burley Avenue. In so doing, the trial court pointed out that the information retrieved at 8521 South Burley Avenue resulted from the "wrongful detention in bringing [defendant] back across the state line," which was the same basis the court utilized in granting defendant's motion to vacate.

Our conclusion that this court has jurisdiction to consider the validity of the house search is further supported by the State's notice of appeal. The notice of appeal referenced two dates of judgment or order: June 8, 2004, and July 21, 2004. As already discussed, the trial court granted defendant's motion to vacate, thus granting defendant's first filed motion to suppress (which we find included the evidence seized at the house search), on June 8, 2004. On the same date, the trial court granted defendant's motion to suppress evidence seized at 8521 South Burley Avenue. The July 21, 2004, date references the trial court's denial of the State's motion to reconsider the June 8 ruling. In its motion to reconsider, the State specifically asked the trial court to "reconsider its rulings on June 8, 2004, to reinstate its findings that there was probable cause to arrest Defendant and that the cannabis from Defendant's vehicle was properly seized, and to find that the evidence seized from the Burley address resulted from a voluntary and properly obtained consent to search." Accordingly, the State's notice of appeal adequately referred to the home search.

In light of the above, we find that the State complied with this court's rules and we will consider the validity of the search of the Burley Avenue address. As already noted, we do not find any of the

State's argument forfeited and will consider the State's arguments concerning extradition and good faith. Finding that the State has adequately preserved its arguments, we turn to the merits.

## B. Merits

The two Indiana statutory sections primarily at issue in this case comprise portions of Indiana's Uniform Act on Fresh Pursuit. The first section (Ind. Code Ann. §35–33–3–1 (Michie 1998)), entitled "Fresh pursuit–Peace officers of other states–Authority to arrest in Indiana," provides:

> "Any member of a duly organized state, county, or municipal peace unit of another state who enters this state in fresh pursuit, and continues within this state in such fresh pursuit of a person in order to arrest him on ground that he is believed to have committed a felony in the other state, shall have the same authority to arrest and hold such person in custody as has any law enforcement officer of this state to arrest and hold in custody a person on the ground that he is believed to have committed a felony in this state."

The second section, Ind. Code Ann. §35–33–3–2 (LexisNexis 1998), entitled "Arrest–Hearing–Commitment or discharge," provides:

> "If an arrest is made in this state by an officer of another state in accordance with the provisions of section 1 of this chapter, he shall, without unnecessary delay, take the person arrested before a judge of the county in which the arrest was made. The judge shall conduct a hearing for the purpose of determining the lawfulness of the arrest. If the judge determines that the arrest was lawful, he shall commit the person arrested to await for a reasonable time the issuance of an extradition warrant by the governor of this state. If the judge determines that the arrest was unlawful, he shall discharge the person arrested."

The trial and appellate courts found that because the Chicago police officers did not comply with the second statutory section, Ind. Code Ann. §35–33–3–2 (LexisNexis 1998), they were not authorized to arrest defendant and thus the evidence against him must be suppressed.

## I. The State's Position

The State points out that in *Gerstein v. Pugh*, 420 U.S. 103, 111, 43 L. Ed. 2d 54, 63, 95 S. Ct. 854, 861 (1975), the United States Supreme Court found that "the standards and procedures for arrest and detention have been derived from the Fourth Amendment and its common-law antecedents." Moreover, this court has recognized that at common law police officers had the authority to arrest a defendant outside the territorial limits of the political entity which appointed them to their office when the officers were in fresh pursuit of a felon or a suspected felon fleeing that jurisdiction. *People v. Lahr*, 147 Ill. 2d 379, 382 (1992). According to the State, Indiana's Uniform Act on Fresh Pursuit merely codifies the common law principle authorizing felony fresh pursuit extraterritorial arrest which has already been codified in the fourth amendment.

The State asserts that it complied with the fourth amendment in this case. The State points out that the trial court initially denied defendant's motion to quash and suppress after a full evidentiary hearing, considering extensive testimony regarding defendant's arrest, the search of his car, and the search of the Burley Avenue address. Upon reconsidering its rulings, the trial court never questioned the court's initial findings, this time only altering its ultimate legal conclusion based upon defendant's statutory argument. Likewise, the appellate court limited its consideration to the legal questions revolving around noncompliance with Indiana's fresh pursuit statute and whether the proper remedy is suppression. 367 Ill. App. 3d at 879. According to the State, then, while Chicago police may not have complied with Indiana's post-arrest statutory procedures, their actions arresting defendant and seizing evidence against him clearly comport with the fourth amendment and its common law antecedents.

The State further points out that the arrest was substantively authorized by Indiana statute. In fact, the appellate court specifically noted that "[t]he parties agree that, in compliance with section 35–33–3–1 of Indiana's fresh pursuit statute, the Chicago police were properly in fresh pursuit of defendant, whom the Chicago police believed had committed a felony." 367 Ill. App. 3d at 880. Even in his brief before this court, defendant acknowledges the same, stating that he agrees "Chicago police officers had the authority to follow the

defendant into the State of Indiana, and Indiana having adopted the Uniform Act on Fresh Pursuit, arrest him."

According to the State, only section 35–33–3–2 of Indiana's fresh pursuit statute was violated, and unless that provision is mandated by a component of the federal Constitution, noncompliance with the section has no bearing on the legitimacy of the arrest or the subsequent actions of the Chicago police and State of Illinois. The State asserts that because this is an Illinois prosecution, in an Illinois court, for offenses committed wholly within Illinois' borders, and because the arrest complies with the fourth amendment, whether Illinois evaluates the matter with respect to Indiana's statutory scheme presents a discretionary question premised upon principles of comity. Put simply, the State asserts that the Chicago police officers' noncompliance with Ind. Code Ann. §35–33–3–2 (LexisNexis 1998) did not make defendant's arrest unlawful.

The State points out that section 35–33–3–2 of Indiana's fresh pursuit statute not only provides an arrestee with a probable cause hearing, but also serves to set forth the initial step in the extradition process which typically takes place in an interstate fresh pursuit scenario. In this case, the State acknowledges that by summarily removing defendant from Indiana and bringing him to Illinois to face prosecution, the Chicago officers bypassed the procedural mechanisms set forth in section 35–33–3–2, and indeed the entirety of the statute's extradition proceedings. Nevertheless, the State argues that this did not offend the extradition clause or the prompt presentment requirements of the federal Constitution.

The extradition clause provides that "[a] Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime." U.S. Const., art. IV, §2. The State points out, though, that a long line of United States Supreme Court precedent, known as the *Ker-Frisbie* doctrine, has established that irregularities in the extradition of a fugitive from justice for an otherwise constitutional prosecution "affects neither the guilt nor innocence of the accused, nor the jurisdiction of the court to try him." *Ker v. People*, 110 Ill. 627, 637 (1884), *aff'd*, 119 U.S. 436, 30 L. Ed. 421, 7 S. Ct. 225 (1886);

*Frisbie v. Collins*, 342 U.S. 519, 96 L. Ed. 541, 72 S. Ct. 509 (1952); *United States v. Alvarez-Machain*, 504 U.S. 655, 119 L. Ed. 2d 441, 112 S. Ct. 2188 (1992). In *Mahon v. Justice*, 127 U.S. 700, 712, 32 L. Ed. 283, 287, 8 S. Ct. 1204, 1211 (1888), the Supreme Court held that "the offender against the law of the State is not relieved from liability \*\*\* because of indignities committed against another state." More recently, the Supreme Court, considering principles of federalism, noted that "an accused 'should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other, unless the necessary operation of such machinery prevents his having a fair trial.' " *Wilson v. Schnettler*, 365 U.S 381, 385, 5 L. Ed. 2d 620, 624, 81 S. Ct. 632, 635 (1961), quoting *Ponzi v. Fessenden*, 258 U.S. 254, 260, 66 L. Ed. 607, 611, 42 S. Ct. 309, 310 (1922).

In the State's view, the above makes clear that Illinois courts are not required to measure defendant's arrest by the statutory overlays of Indiana's postarrest procedural provision. The State asserts that if there is any affront in this case, it is to Indiana and not to defendant. Considering this, the State acknowledges that this court could elect to decline to exercise jurisdiction as a discretionary matter premised upon comity. The State argues, though, that this court should not do so in view of its longstanding adherence to the *Ker-Frisbie* doctrine, as well as the Supreme Court of Indiana's adherence to the same. *Ker*, 110 Ill. 627; *People v. Klinger*, 319 Ill. 275, 278 (1925); *People ex rel. Lehman v. Frye*, 35 Ill. 2d 343 (1966); *Massey v. State*, 267 Ind. 504, 507, 371 N.E.2d 703, 705 (1978) ("A trial court's jurisdiction does not depend upon the legality of [defendant's] arrest or return to the wanting state"). Indeed, the State points out that the Supreme Court of Indiana has recognized that comity, in certain circumstances, should not be utilized so as to effect the release of a defendant based upon mere technicalities. *Cozart v. Wolf*, 185 Ind. 505, 512-13, 112 N.E. 241, 243 (1916).

Corollary to the above, the State points out that while defendant was not afforded a *Gerstein* hearing in Indiana as required by Ind. Code Ann. §35–33–3–2 (LexisNexis 1998), he was afforded a proper *Gerstein* hearing in Illinois. Such a hearing, mandated by the fourth amendment, affords a defendant arrested without a warrant prompt "judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein*, 420 U.S. at 114, 43 L.

Ed. 2d at 65, 95 S. Ct. at 863. Since a *Gerstein* hearing was held, then, the State contends that the fact that the hearing did not take place in Indiana should render defendant's arrest unlawful only if this court chooses to acknowledge and give effect to Ind. Code Ann. §35–33–3–2 (LexisNexis 1998) based upon principles of comity. For the reasons already discussed, the State argues against this. Moreover, the State points out that courts in other states have held that as long as a *Gerstein* hearing is properly held, what state it is held in is constitutionally insignificant. See *Six Feathers v. State*, 611 P.2d 857, 862 (Wyo. 1980); *Weaver v. Commonwealth*, 29 Va. App. 487, 513 S.E.2d 423 (1999).

In addition to the above arguments, the State asserts that the exclusionary rule is inapplicable to the facts of this case. The State notes that by its plain language, the fourth amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Arizona v. Evans*, 514 U.S. 1, 10, 131 L. Ed. 2d 34, 43, 115 S. Ct. 1185, 1191 (1995). The Supreme Court crafted the exclusionary rule as a "judicially created remedy" to "safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348, 38 L. Ed. 2d 561, 571, 94 S. Ct. 613, 620 (1974). The exclusionary rule is not reflexively applied. The Supreme Court has even stated that "[s]uppression of evidence *** has always been our last resort, not our first impulse." *Hudson*, 547 U.S. at 591, 165 L. Ed. 2d at 64, 126 S. Ct. at 2163. Indeed, the rule is only applied where its deterrence benefits outweigh its substantial societal costs. *Hudson*, 547 U.S. at 591, 165 L. Ed. 2d at 64, 126 S. Ct. at 2163.

The State asserts that the exclusionary rule was designed to police federal constitutional violations rather than nonconstitutionally compelled state statutory violations, particularly where the arrest itself was constitutionally legitimate. See, *e.g.*, *United States v. Caceres*, 440 U.S. 741, 59 L. Ed. 2d 733, 99 S. Ct. 1465 (1979) (considering a violation of IRS regulations which did not rise to the level of a constitutional violation and noting that "our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application"). Additionally, the State points out that outside the mandatory reach of the federal constitutional exclusionary rule, the Supreme Court has found that "[t]he States are not

foreclosed by the Due Process Clause from using a similar [cost/benefit] balancing approach to delineate the scope of their own exclusionary rules." *California v. Greenwood*, 486 U.S. 35, 44-45, 100 L. Ed. 2d 30, 39-40, 108 S. Ct. 1625, 1631 (1988). This court has recognized this principle and utilized it in numerous instances. See, *e.g.*, *People v. DeMorrow*, 59 Ill. 2d 352, 354 (1974) ("whether or not any given search and seizure is unconstitutional, as violative of the fourth *** amendment[ ], as a matter of substantive law, is to be decided by the pronouncements of the United States Supreme Court. *** The decision of what State courts may deem to be admissible in their systems according to their laws of evidence is an entirely separate question"); *People v. Willis*, 215 Ill. 2d 517, 532 (2005) (exclusionary rule not applied where detention ran afoul of *Gerstein*, but confession voluntary); *People v. Burnidge*, 178 Ill. 2d 429 (1997) (exclusionary rule not applied because of violation of clergy/penitent evidentiary privilege); *People v. Harris*, 182 Ill. 2d 114 (1998) (exclusionary rule not applied where defendant was transferred from jail in violation of Illinois Habeas Corpus Act).

Considering the above, the State argues that not only is the application of the exclusionary rule not compelled by the federal Constitution, it is also not compelled by this state's own exclusionary principles. The State points out that this court has noted that "there is no constitutional barrier, other than the fourth amendment, which precludes one jurisdiction from refusing to honor the standards of another relative to the validity of an arrest or search." *People v. Saiken*, 49 Ill. 2d 504, 510 (1971). Moreover, precedent establishes a trend on the part of courts in other states not to invoke their exclusionary rules as a *per se* remedy in situations involving a constitutional extraterritorial arrest that also violated a statutory provision of a nonconstitutional dimension. See, *e.g.*, *People v. Porter*, 742 P.2d 922 (Colo. 1987); *State v. Pike*, 642 A.2d 145 (Me. 1994); *City of Kettering v. Hollen*, 64 Ohio St. 2d 232, 416 N.E.2d 598 (1980); *Frye v. Commonwealth*, 231 Va. 370, 345 S.E.2d 267 (1986); *State v. Barker*, 143 Wash. 2d 915, 25 P.3d 423 (2001).

Applying the deterrence benefits/societal costs analysis of the exclusionary rule specifically, the State points out that the officers involved in this case were not even aware that they were in Indiana when they arrested defendant. Accordingly, the police officers did not

violate Indiana's statutory procedure for extradition out of disrespect for Indiana's laws or territorial borders, but because defendant ran for the border. The State notes that the exclusionary rule is "calculated to prevent, not to repair." *Elkins v. United States*, 364 U.S. 206, 217, 4 L. Ed. 2d 1669, 1677, 80 S. Ct. 1437, 1444 (1960). As such, the State argues that applying the exclusionary rule in this situation, involving inadvertent police action, would not act as a deterrent, as the officers would not even be aware of their error. Further, the State argues that applying the exclusionary rule would have substantial societal cost.

## II. Defendant's Position

Defendant agrees that Chicago police had the authority to follow defendant into Indiana and arrest him, citing Ind. Code Ann. §35–33–3–1 (Michie 1998). However, defendant disagrees with the State that officers were free to disregard Ind. Code Ann. §35–33–3–2 (Michie 1998). Supporting his position, defendant notes that in *United States v. Di Re*, 332 U.S. 581, 589, 92 L. Ed. 210, 217, 68 S. Ct. 222, 226 (1948), the Supreme Court stated that "in the absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity."

Defendant points out that in *Wyoming v. Houghton*, 526 U.S. 295, 299-300, 143 L. Ed. 2d 408, 414, 119 S. Ct. 1297, 1300 (1999), the Supreme Court stated that to determine whether a governmental action violates the fourth amendment, courts must "inquire first whether the action was regarded as an unlawful search or seizure under the common law when the [fourth] Amendment was framed." Defendant argues that examining the common law of arrest as it existed in Indiana before the adoption of the Uniform Act on Fresh Pursuit, it is clear that Chicago police would not have been able even to make an arrest pursuant to a lawful warrant in Indiana. *Martin v. Newland*, 196 Ind. 58, 61, 147 N.E. 141, 142 (1925) ("a warrant issued by a court in Illinois could not have any extraterritorial effect, and conferred no authority to arrest and imprison the petitioner in Indiana, without a warrant issued by a court or other proper officer of the State of Indiana").

Defendant further argues that this court has rejected the position that Illinois police officers are free to disregard the statutes limiting

their jurisdiction. Defendant points to *People v. Lahr*, where this court considered a situation where a defendant was arrested by a Sleepy Hollow, Illinois, police officer outside of Sleepy Hollow's boundaries and held that the arrest powers of a law enforcement officer operating " 'outside of the respective police authorities' area of jurisdiction' " are circumscribed and limited to those possessed by a citizen. *Lahr*, 147 Ill. 2d at 387.

Similarly, defendant points to *People v. Carrera*, 203 Ill. 2d 1 (2002), where this court considered a situation where Chicago police officers, after conducting surveillance, arrested a defendant in Franklin Park, Illinois. The defendant in *Carrera* asserted that Chicago police officers did not have the authority to arrest him outside the territorial limits of the City of Chicago. This court agreed, holding that "Illinois law is settled that the exclusionary rule is applicable where the police effectuate an extraterritorial arrest without appropriate statutory authority." *Carrera*, 203 Ill. 2d at 11.

According to defendant, *Lahr* and *Carrera* refute the State's argument that the existence of probable cause to arrest is the only requirement for a valid arrest. In defendant's view, it is illogical to contend that a Sleepy Hollow, Illinois, police officer may not use his police arrest powers to arrest outside Sleepy Hollow, Illinois, and that a Chicago, Illinois, police officer may not make a valid arrest supported by probable cause in Franklin Park, Illinois, absent statutory authority, but that the same Chicago police officer has the authority to enter and make an arrest in Indiana and remove the arrestee to Illinois.

Considering the exclusionary rule and its application to the facts of this case, defendant points to *Commonwealth v. Sadvari*, 561 Pa. 588, 752 A.2d 393 (2000). In *Sadvari*, Pennsylvania state troopers stopped a speeding defendant less than a mile inside the State of Delaware, performed sobriety tests on the defendant which he failed, and then transported him back to Pennsylvania for chemical testing. The defendant moved to suppress the results of the chemical test, asserting that his arrest did not conform to the Delaware fresh pursuit statute, as a Delaware magistrate was not afforded the opportunity to consider the lawfulness of the arrest. The Supreme Court of Pennsylvania held that because the Pennsylvania state troopers ignored Delaware's statutory requirement that the defendant be

brought before a Delaware court, "the arrest was illegal." *Sadvari*, 561 Pa. at 598, 752 A.2d at 398. Additionally, in considering the remedy, the Pennsylvania Supreme Court held that "application of the exclusionary rule will serve primarily as a demonstration of comity to vindicate Delaware's sovereignty in light of Pennsylvania's incursion upon this important state interest. Suppression is also appropriate to encourage future compliance with Delaware's procedures and, in a more general sense, to safeguard the individual right to be free from unlawful seizures." *Sadvari*, 561 Pa. at 598-99, 752 A.2d at 399.

Additionally, defendant points to *People v. Jacobs*, 67 Ill. App. 3d 447 (1979), where our appellate court considered a situation where Illinois police obtained a warrant for a defendant's arrest, pursued him into the State of Iowa, arrested him, and brought him back to Illinois, where he was extensively interrogated and eventually confessed. The *Jacobs* court held that the Illinois police officers had no authority to arrest the defendant, except that granted them by the uniform fresh pursuit law of the State of Iowa. *Jacobs*, 67 Ill. App. 3d at 449. That law, similar to Ind. Code Ann. §35–33–3–2 (Michie 1998), required out-of-state police officers, after effecting an arrest, to take the person arrested before an in-state magistrate for a *Gerstein* hearing, among other things. *Jacobs*, 67 Ill. App. 3d at 449-50. The *Jacobs* court held that because the mandates of Iowa's fresh pursuit law were "blithely and summarily ignored," the defendant's later confessions stemmed from an illegal arrest and were inadmissible.

Further supporting his position, defendant cites *United States v. Holmes*, 380 A.2d 598 (D.C. App. 1977), where the District of Columbia Court of Appeals considered a situation where Maryland police officers arrested a defendant in the District of Colombia as he got off a bus from Maryland. While the defendant consented to return to Maryland, the court held that the consent was illegally procured and noted that "this court has heretofore made clear that such an arrest is valid *only* under authority of the Uniform Act on Fresh Pursuit." (Emphasis in original.) *Holmes*, 380 A.2d at 600.

Substantively addressing the State's argument concerning good faith, defendant asserts that the good-faith doctrine is limited to arrests and searches conducted pursuant to a warrant. Defendant's argument on this point is brief. Defendant points out that the Supreme Court has stated that "[r]easonable minds frequently may differ on the

question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." *United States v. Leon*, 468 U.S. 897, 914, 82 L. Ed. 2d 677, 693, 104 S. Ct. 3405, 3416 (1984). Moreover, citing to *People v. Turnage*, 162 Ill. 2d 299, 308 (1994), defendant points out that this court has stated that "[t]he *Leon* Court was careful to limit the contours of its ruling." Additionally, defendant asserts that the subjective beliefs of an arresting officer are irrelevant with regard to establishing probable cause for a warrantless arrest. See *Whren v. United States*, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 98, 116 S. Ct. 1769, 1774 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").

### III. Extradition Irregularities, the Exclusionary Rule, and the Facts of This Case

We agree with the State that defendant's arrest should not be quashed nor the evidence against him suppressed. The Supreme Court has stated that to determine whether a governmental action violates the fourth amendment, courts must "inquire first whether the action was regarded as an unlawful search or seizure under the common law when the [fourth] Amendment was framed." *Houghton*, 526 U.S. at 299-300, 143 L. Ed. 2d at 414, 119 S. Ct. at 1300. This does not mean, as defendant suggests, however, that we must examine the common law of arrest as it existed in Indiana before the adoption of the Uniform Act on Fresh Pursuit. Instead, as the State suggests, it means that we must examine the common law in place at the time of the enactment of the fourth amendment. As noted above, this court has already done this, stating, "[a]t common law, municipal and county police officers had no authority to arrest a defendant outside the territorial limits of the political entity which appointed them to their office. The sole exception to this rule at common law was when the officers were in 'fresh pursuit' of a suspected felon fleeing that jurisdiction." *Lahr*, 147 Ill. 2d at 382.

Here, the evidence clearly indicates that the Chicago police officers who eventually stopped defendant did so believing that he was engaged in drug trafficking and was attempting to escape. The Chicago police officers were thus in fresh pursuit of a person they

suspected to be a fleeing felon. Pursuant to our analysis in *Lahr*, then, they had the commonlaw authority to effect an arrest of that person outside the territorial limits of the political entity that appointed them. Additionally, there is no question, and defendant has even agreed, that the arrest that occurred in this case was substantively authorized by Indiana statute. See Ind. Code Ann. §35–33–3–1 (Michie 1998).

It is also worth noting that defendant's sole fourth amendment argument before this court revolves around his contention that Chicago police violated Ind. Code Ann. §35–33–3–2 (Michie 1998). This is not surprising considering the procedural posture of this case. As already detailed, defendant's first filed motion to suppress was very broad, requesting the trial court quash his arrest and suppress, among other things, the "[p]hysical evidence discovered and as a result of arrest and detention" and "[a]ll other knowledge and fruits *** and products of the arrest." After holding a detailed evidentiary hearing and considering extensive argument on this motion, including evidence and argument regarding the home search, the trial court denied the motion to quash and suppress. Before this court, defendant advances no fourth amendment argument other than that based upon Indiana statute. Accordingly, if we find no fourth amendment violation based upon Indiana statute, there is no other basis argued for us to find such a violation. Defendant already advanced a variety of other fourth amendment based arguments in the trial court, lost those arguments, and no longer advances them on appeal.

The Illinois cases defendant cites do not settle this case as a matter of law. *Lahr*, *Carrera*, and *Jacobs* all involved situations distinguishable from this case. In *Lahr*, the defendant was not a fleeing felon and he was arrested by a police officer using his police authority outside of the territorial limits of the political entity which appointed him. *Lahr*, 147 Ill. 2d at 382, 386-87. This arrest was thus invalid. *Lahr*, 147 Ill. 2d at 386-87. In *Carrera*, the defendant was arrested by police officers utilizing a statute that was later declared void *ab initio*. *Carrera*, 203 Ill. 2d at 14-15. Accordingly, this court held that the defendant's arrest was unlawful. *Carrera*, 203 Ill. 2d at 17. In *Jacobs*, it appears that police were not in fresh pursuit of the defendant, as he was arrested in Iowa a day after police had already interrogated and released him. *Jacobs*, 67 Ill. App. 3d at 448. Accordingly, the actual arrest at issue in the *Jacobs* case may have been invalid even without

considering postarrest irregularities. *Jacobs*, 67 Ill. App. 3d at 449. Additionally, the appellate court in *Jacobs* noted that its decision in that case may well have been based upon entirely different reasoning. *Jacobs*, 67 Ill. App. 3d at 449 ("It may well be that in spite of having received *Miranda* warnings the totality of the circumstances, to-wit, the defendant's age, I.Q., reading level, circumstances of his arrest, the deprecatory advice as to need of counsel, the minimization as to the seriousness of the crime of murder by a minor, and the police officer's offer to help the defendant in any way he could, when considered in their entirety, might well require the suppression of all statements made by the defendant during his interrogation session with the law enforcement authorities of Rock Island County"). Unlike the present case, then, *Lahr*, *Carrera* and *Jacobs*, all involved situations where defendant's arrest occurred under very different circumstances than those present here.

Defendant's citation to the *Holmes* decision is similarly distinguishable. While the District of Columbia Court of Appeals touched upon the magistrate provision of Maryland's fresh pursuit statute similar to the statutory provision at issue in this case, it was also questionable whether the defendant's arrest was valid. *Holmes*, 380 A.2d at 600 (noting that the trial court's basis for suppressing evidence included the fact that "Holmes was arrested without probable cause ***. Police failed to present Holmes to a District of Columbia court in accord with statutory provisions. There was ineffective inquiry into Holmes' understanding of his rights. Holmes was intensively interrogated for some four hours in the middle of the night ***. In sum, the police created and exploited circumstances which resulted in legally inadmissible statements"). Moreover, the court's ultimate conclusion in the case was based upon its finding that the trial court properly found that the defendant's consent to leave the District without a hearing and extradition was involuntary. *Holmes*, 380 A.2d at 602. As such, none of the cases defendant cites settle the question at issue in this case, that being whether one state's noncompliance with another state's postarrest procedural statute makes a defendant's arrest unlawful where it would otherwise be completely lawful.

While this court has held that "Illinois law is settled that the exclusionary rule is applicable where the police effectuate an extraterritorial arrest without appropriate statutory authority"

(*Carrera*, 203 Ill. 2d at 11), it has never considered the situation involved here, where Illinois authorities validly arrested a defendant but failed to comply with another state's statutory postarrest procedural requirements by failing to present that defendant to a magistrate in the other state for the determination of probable cause and a formal beginning of the extradition process. Courts in other states have considered this question and come to different conclusions.

Some courts have considered situations involving constitutional extraterritorial arrests that also violated a nonconstitutional statutory provision of a foreign state and been unwilling to invoke the exclusionary rule as a remedy. See *State v. Dentler*, 742 N.W.2d 84, 90 (Iowa 2007) (considering the magistrate provision of Missouri's version of the uniform fresh pursuit statute almost identical to that at issue in this case and refusing to apply the exclusionary rule, characterizing the violation as "a statutory violation that does not involve fundamental rights, constitutional overtones, or false representations of law or other similar police misconduct"); *State v. Ferrell*, 218 Neb. 463, 468, 356 N.W.2d 868, 871 (1984) (considering the magistrate provision of Iowa's version of the uniform fresh pursuit statute almost identical to that at issue in this case and refusing to apply the exclusionary rule finding that the statutory violation did not affect the validity of the arrest or amount to a due process violation); *State v. Bond*, 98 Wash. 2d 1, 14, 653 P.2d 1024, 1032 (1982) (*en banc*) (refusing to exclude evidence in a situation where a defendant was arrested by Washington officers in Oregon and removed to Washington without presentation to an Oregon magistrate as statutorily required and noting that "[t]he improper interstate rendition was merely incidental to the arrest and represented no new intrusion into defendant's privacy. It represented more of an affront to the rights of the State of Oregon than of the defendant").

By contrast, as defendant describes in detail, other courts have applied the exclusionary rule in situations involving constitutional extraterritorial arrests that also violated a nonconstitutional statutory provision of a foreign state. See *Sadvari*, 561 Pa. at 588, 752 A.2d 393; *Jacobs*, 67 Ill. App. 3d 447; *Holmes*, 380 A.2d 598.

We find the analysis in *Dentler*, *Ferrel*, and *Bond* more persuasive than that found in *Sadvari*, *Jacobs*, and *Holmes*. We find particularly

instructive the analysis utilized in *Dentler*, the most recent case to address this particular issue. After discussing *Sadvari* and *Jacobs*, as well as *Ferrell* and *Bond*, the *Dentler* court noted its commitment to the exclusionary rule. *Dentler*, 742 N.W.2d at 87-88. Next, the *Dentler* court considered the probable cause for the defendant's arrest and pointed out that while he was not brought before a Missouri magistrate, he was promptly taken before an Iowa judge and thus "afforded the opportunity to test the validity of his arrest before a neutral magistrate promptly after his arrest." *Dentler*, 742 N.W.2d at 89. Accordingly, the *Dentler* court found that the defendant's due process rights were not violated. *Dentler*, 742 N.W.2d at 89. The court thus found that the main issue in the case was "whether a violation of Missouri statutory law warrants exclusion of evidence" in Iowa. *Dentler*, 742 N.W.2d at 89.

Considering that issue, the *Dentler* court first asked whether the Missouri statute specifically required the exclusion of evidence and found that it did not. *Dentler*, 742 N.W.2d at 89. Next, the court asked whether the Missouri statute involved a fundamental right of the defendant. *Dentler*, 742 N.W.2d at 89. Likewise, the court found that it did not, pointing out that the main purpose of the magistrate provision was to vindicate the rights of Missouri not the rights of an individual defendant. *Dentler*, 742 N.W.2d at 89 ("To the extent an ox is being gored in this case, it belongs to Missouri, not Dentler. *** Ordinarily, a party seeking to invoke the exclusionary rule may not vicariously assert the rights of another"). Following this, and perhaps in a nod to principles of comity, the court noted that the defendant made no argument that there existed a fundamental public policy difference between Missouri and Iowa which militated in favor of exclusion. *Dentler*, 742 N.W.2d at 89. Finally, the court considered and rejected the concern that without applying the exclusionary rule to the situation at issue there would be insufficient deterrence to avoid future similar violations by Iowa police of Missouri statutory law. *Dentler*, 742 N.W.2d at 90. In so doing, the court stated:

> "Because the benefits of violating the magistrate provision are so small, however, the incentive for future violations is not very high. If we are proven wrong in this assessment, the Missouri legislature may withdraw its authorization of Iowa peace officers to engage in fresh pursuit. Further, because this

opinion is narrowly based on the unique facts of this case, law enforcement officials have no certainty that the exclusionary rule will be held inapplicable under a different state of facts, particularly where the record demonstrates willful misconduct. Finally, in the unlikely event that such violations become a recurrent problem, this court reserves the right to exercise its supervisory powers to exclude the evidence in future cases. [Citations.]" *Dentler*, 742 N.W.2d at 90.

As in *Dentler*, aside from the fact that Chicago police failed to comply with the magistrate provision of Indiana's Fresh Pursuit Statute, defendant's arrest was valid. Defendant's arrest complied with the fourth amendment, its common law antecedents, and Indiana statute. Likewise, while defendant was not brought before an Indiana magistrate, he was promptly taken before an Illinois judge and thus afforded the opportunity to promptly test the validity of his arrest before a neutral magistrate. Accordingly, defendant's due process rights were not violated. See *Six Feathers*, 611 P.2d at 862; *Weaver*, 29 Va. App. 487, 513 S.E.2d 423. The main issue, then, is whether the Chicago police officer's noncompliance with Indiana's postarrest procedural statute makes defendant's arrest unlawful when it would otherwise be completely lawful. In other words, we must consider whether a violation of Indiana statutory law, particularly Ind. Code Ann. §35–33–3–2 (Michie 1998), mandates the exclusion of evidence in Illinois.

We do not believe that the violation of Ind. Code Ann. §35–33–3–2 (Michie 1998) mandates the exclusion of the evidence arrayed against defendant. First, the statutory language itself does not mandate exclusion or even mention it. *People v. Jones*, 223 Ill. 2d 569, 580-81 (2006) ("The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. [Citation.] *** The best indication of legislative intent is the statutory language, given its plain and ordinary meaning"). Next, the Indiana statute, under the facts of this case, does not involve a fundamental right of defendant.

Ind. Code Ann. §35–33–3–2 (Michie 1998) appears to have two main purposes. First, the statute provides an arrestee with a probable cause hearing in Indiana. The fact that defendant had the hearing in Illinois rather than Indiana does not constitute a constitutional violation, however. See *Dentler*, 742 N.W.2d at 89; *Six Feathers,* 611

P.2d at 862; *Weaver*, 29 Va. App. 487, 513 S.E.2d 423. Second, the statute sets forth the initial step in the extradition process. Again, that Chicago police ignored the extradition process in this case does not constitute a constitutional violation. The *Ker-Frisbie* doctrine has established that irregularities in the extradition of a fugitive from justice for an otherwise constitutional prosecution "affects neither the guilt nor innocence of the accused, nor the jurisdiction of the court to try him." *Ker*, 110 Ill. at 637, *aff'd*, 119 U.S. 436, 30 L. Ed. 421, 7 S. Ct. 225; *Frisbie*, 342 U.S. 519, 96 L. Ed. 541, 72 S. Ct. 509; *Matta-Ballesteros v. Henman*, 896 F.2d 255, 260 (7th Cir. 1990) ("For the past 100 years, the Supreme Court has consistently held that the manner in which a defendant is brought to trial does not affect the ability of the government to try him"). In addition to the above, we note that to the extent that any fundamental rights are implicated by Ind. Code Ann. §35–33–3–2 (LexisNexis 1998), they are not the rights of defendant but the rights of Indiana. *Dentler*, 742 N.W.2d at 89; *Ferrell*, 218 Neb. at 468, 356 N.W.2d at 872; see also *Rakas v. Illinois*, 439 U.S. 128, 148, 58 L. Ed. 2d 387, 404, 99 S. Ct. 421, 433 (1978) (a party generally may not vicariously asserts the rights of another when seeking to invoke the exclusionary rule); *Alderman v. United States*, 394 U.S. 165, 174, 22 L. Ed. 2d 176, 187, 89 S. Ct. 961, 966-67 (1969) (same).

Considering the exclusionary rule itself, we note that the Supreme Court has stated that "[s]uppression of evidence *** has always been our last resort, not our first impulse," and applied the rule only where its deterrence benefits outweigh its substantial societal costs.[1] *Hudson*,

---

[1]In discussing the exclusionary rule, we feel it worth mentioning that apart from his reference to *Sadvari*, 561 Pa. 588, 752 A.2d 393, defendant advances little substantive argument regarding the application of the exclusionary rule. Defendant does advance an argument concerning the good-faith doctrine and its application in situations where police are operating without a warrant. As we discussed when considering defendant's procedural arguments, however, the State is not advocating the application of the good-faith exception to the exclusionary rule. Rather, the State merely discusses the good faith of the Chicago police officers involved in this case in order to show that the exclusionary rule should never even apply. Accordingly, defendant's argument on this point does not address the State's position or

547 U.S. at 591, 165 L. Ed. 2d at 64, 126 S. Ct. at 2163. This court, in discussing the rule, has stated:

> "[T]he exclusionary rule that accompanies the fourth amendment has no constitutional footing. Instead, it is a judicially created, prudential remedy that prospectively protects fourth amendment rights by deterring future police misconduct [Citations.] Its application has been trimmed to instances where its remedial objectives will be most effectively served. [Citation.] That is, it applies only where its deterrent benefits outweigh its substantial social costs." *Willis*, 215 Ill. 2d at 531-32.

Indeed, we have recognized that "[t]he State does not violate the fourth amendment when it introduces evidence obtained in violation of the fourth amendment. [Citation.] Rather, a fourth amendment violation is 'fully accomplished' by the illegal search or seizure, and excluding evidence cannot undo the invasion of the defendant's rights." *Willis*, 215 Ill. 2d at 531. As such, in *Willis* this court refused to apply the exclusionary rule in a situation where the fourth amendment was actually violated. See *Willis*, 215 Ill. 2d 517. By contrast, in this case, there was no constitutional violation and exclusion is even less warranted. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, ___, 165 L. Ed. 2d 557, 577, 126 S. Ct. 2669, 2681 (2006) (statutory violations only remotely related to the gathering of evidence do not ordinarily trigger application of the exclusionary rule).

The deterrence benefits/societal costs analysis supports this position. Here, the Chicago police officers involved were not even aware that they were in Indiana when they arrested defendant. Accordingly, the arrest did not involve any police misconduct, willful disregard for the laws of Indiana or its territorial borders, or false representations of law designed to improperly obtain evidence. Additionally, as the Iowa Supreme Court recognized in *Dentler*, the benefits of violating another state's statutory magistrate provision are so small, any incentive for future violations is low. *Dentler*, 742 N.W.2d at 90. While applying the exclusionary rule under the facts of this case would thus have little deterrent effect, it would have

---

affect our analysis.

significant societal costs, as the State has already acknowledged that without the evidence against defendant, its case against him would be substantially impaired. As we have stated in the past, the exclusionary rule laudably secures constitutional rights through its deterrent effect but "also deflects criminal trials from their basic focus by erecting barriers between the jury and truthful, probative evidence." *Willis*, 215 Ill. 2d at 532. Moreover, the Supreme Court has recognized the same, pointing out that its cases have "consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." *United States v. Payner*, 447 U.S. 727, 734, 65 L. Ed. 2d 468, 476, 100 S. Ct. 2439, 2445 (1980).

While we choose not to apply the exclusionary rule in this case, we could elect to utilize it based upon principles of comity. *Sadvari*, 561 Pa. at 598-99, 752 A.2d at 398-99 ("We find, however, that the Delaware statute, with its directive that an out-of-state officer present the arrestee to a Delaware judicial tribunal for review of the lawfulness of an arrest conducted in Delaware, functions as more than merely an extradition statute, and that a contrary interpretation would render empty the mandate of the Delaware law. *** In this instance, application of the exclusionary rule will serve primarily as a demonstration of comity to vindicate Delaware's sovereignty in light of Pennsylvania's incursion upon this important state interest"). Not only has this court long adhered to the *Ker-Frisbie* doctrine, however, but so has the Indiana Supreme Court. In fact, in *Massey v. Indiana*, the Indiana Supreme Court specifically cited both *Ker* and *Frisbie* and stated that "[a] trial court's jurisdiction does not depend upon the legality of [defendant's] arrest or return to the wanting state." *Massey*, 267 Ind. at 507, 371 N.E.2d at 705. Accordingly, we do not believe principles of comity require the application of the exclusionary rule in this case. Moreover, in light of its long adherence to the *Ker-Frisbie* doctrine, we believe it unlikely that the Indiana Supreme Court would find any differently were it faced with this situation in reverse.

With this opinion, we reaffirm our adherence to the *Ker-Frisbie* doctrine. *Ker*, 110 Ill. at 637, *aff'd*, 119 U.S. 436, 30 L. Ed. 421, 7 S. Ct. 225; *Frisbie*, 342 U.S. 519, 96 L. Ed. 541, 72 S. Ct. 509. This is not to say, however, that Illinois courts may completely ignore another state's statutory scheme providing postarrest procedures for

defendants who committed crimes within Illinois' borders. To the contrary, in such situations courts should inquire into the facts of each case as well as the extraterritorial statutory provisions at issue. Indeed, that is exactly what we have done in this case. Based upon the particular facts and statutory provisions at issue in this case, then, we will not apply the exclusionary rule. We feel it important to point out, however, that law enforcement officials should not consider it a certainty that we will find the exclusionary rule inappropriate under a different set of facts, particularly in situations involving willful misconduct. *Dentler*, 742 N.W.2d at 90.

## CONCLUSION

We reverse the judgment of the appellate court affirming the decision of the trial court. We thus reinstate the trial court's original determination that defendant's motion to quash and suppress be denied and remand the cause to the circuit court for trial.

*Reversed and remanded.*

JUSTICE BURKE, specially concurring:

While the majority correctly reverses the judgment of the appellate court, it omits any discussion of the appellate court's reasoning and fails to explain why that reasoning was in error. I write separately to do so.

The appellate court provided a straightforward analysis in support of its decision to affirm the circuit court's granting of defendant's motion to suppress. At the outset, the appellate court noted that there was no dispute in this case that the Chicago police officers who arrested defendant in Indiana were in fresh pursuit when they crossed the state line. The appellate court further noted that section 35–33–3–1 of Indiana's fresh pursuit statute (Ind. Code Ann. §35–33–3–1 (Michie 1998)) provides the statutory authority for an out-of-state officer to effect an arrest in Indiana when the officer is in fresh pursuit. Section 35–33–3–1 states:

> "Any member of a duly organized state, county or municipal peace unit of another state who enters this state in

-33-

fresh pursuit, and continues within [Indiana] in such fresh pursuit of a person in order to arrest him on ground that he is believed to have committed a felony in the other state, shall have the same authority to arrest and hold such person in custody as has any law enforcement officer of this state to arrest and hold in custody a person on the ground that he is believed to have committed a felony in this state." Ind. Code Ann. §35–33–3–1 (Michie 1998).

The appellate court then observed, however, that the Chicago officers, in violation of section 35–33–3–2 of the Indiana statute (Ind. Code Ann. §35–33–3–2 (Michie 1998)), failed to bring defendant before an Indiana judge before returning him to Illinois. Section 35–33–3–2 provides:

> "If an arrest is made in this state by an officer of another state in accordance with the provisions of section 1 of this chapter, he shall, without unnecessary delay, take the person arrested before a judge of the county in which the arrest was made. The judge shall conduct a hearing for the purpose of determining the lawfulness of the arrest. If the judge determines that the arrest was lawful, he shall commit the person arrested to await for a reasonable time the issuance of an extradition warrant by the governor of this state. If the judge determines that the arrest was unlawful, he shall discharge the person arrested." Ind. Code Ann. §35–33–3–2 (Michie 1998).

The appellate court concluded, as a matter of statutory interpretation, that the police officers' failure to comply with the presentment requirements of section 35–33–3–2 rendered defendant's arrest statutorily invalid. The court explained:

> "Chicago police officers had no inherent authority to effect an arrest in Indiana; rather, the Chicago police officers' authority to make an arrest in Indiana was derived from Indiana's fresh pursuit statute and the authority provided by the Indiana statute is *conditioned by* the requirement that an accused shall be brought before an Indiana judge for a determination of the lawfulness of the arrest. Accordingly, under the rationale of *People v. Jacobs*, 67 Ill. App. 3d 447, which we endorse,

> defendant's arrest was unlawful." (Emphasis added.) 367 Ill.
> App. 3d at 881.

According to the appellate court, the presentment requirement in section 35–33–3–2 was a condition precedent to the authority granted in section 35–33–3–1. The failure to comply with the presentment requirement meant that the officers had no statutory authority to arrest defendant.

The appellate court then pointed to this court's decision in *People v. Carrera*, 203 Ill. 2d 1, 11-12 (2002), which holds that a police officer's right to arrest a person outside his jurisdiction is no greater than that of a private citizen and "that the exclusionary rule is applicable where the police effectuate an extraterritorial arrest without appropriate statutory authority." See also, *e.g.*, *Commonwealth v. Savage*, 430 Mass. 341, 719 N.E.2d 473 (1999) (invoking the exclusionary rule when an out-of-state officer effected an extraterritorial arrest without statutory or common law authority). Because the appellate court had determined that defendant's arrest was made without statutory authority, the court applied the rule of *Carrera* and affirmed the circuit court's grant of defendant's motion to suppress.

In my view, the appellate court erred in its reading of the Indiana fresh-pursuit statute and in its conclusion that defendant's arrest was statutorily unauthorized. It is a well-settled rule that we may not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions. *People v. Martinez*, 184 Ill. 2d 547, 550 (1998). Nothing in the Indiana fresh-pursuit statute states that the presentment requirement of section 35–33–3–2 conditions the authority to arrest provided in section 35–33–3–1. Nor does the statute state that the failure to present a defendant before an Indiana judge negates the authority to arrest a defendant in fresh pursuit. The presentment requirement is a procedure to be followed after a statutorily authorized arrest has been made. See, *e.g.*, *State v. Ferrell*, 218 Neb. 463, 356 N.W.2d 868 (1984); see also *People v. Junco*, 70 Misc. 2d 73, 333 N.Y.S.2d 142 (NY. Sup. Ct. 1972) (describing the condition-precedent argument as an "exotic assertion" that would impose absolute liability on all inadvertent violations of the presentment requirement), *aff'd*, *People v. Walls*, 35 N.Y.2d 419, 321 N.E.2d 875, 363 N.Y.S.2d 82 (1974).

Of course, having determined that the Chicago police officers were authorized to arrest defendant, there still remains the entirely separate question as to whether the exclusionary rule should be applied when police officers inadvertently fail to comply with the presentment requirement of section 35–33–3–2. For the reasons stated by the majority (see slip op. at 27-32), I agree that it should not. Accordingly, I join in the judgment of the majority.

JUSTICE FREEMAN, dissenting:

Unlike the majority, I believe that this case presents a straightforward question of statutory construction. After examining the plain language of the Indiana fresh pursuit statute, the comments of the drafters, and the relevant precedent, I believe that the lower courts correctly held that application of the exclusionary rule is appropriate in the matter before us. I therefore dissent.

Indiana has enacted a statutory scheme that sets forth procedures to be followed when out-of-state law enforcement officers, who are in "fresh pursuit" of a suspect, arrest that person in Indiana. Ind. Code Ann. §§35–33–3–1 through 35–33–3–5 (Michie 1998). As a prefatory note, this statutory scheme abrogated the common law principles relating to extraterritorial arrests. At common law, a limited exception developed to the general rule confining the authority of an officer to a geographic area which allowed an officer who is in "fresh pursuit" of a suspected felon to make a legally binding arrest in a territorial jurisdiction other than the one in which he has been appointed to act. *People v. Clark*, 46 Ill. App. 3d 240, 242 (1977). The "critical elements" that characterized a "fresh pursuit" under common law were its "continuity and immediacy," and the term "fresh pursuit" connoted "something more than mere casual following." 5 Am. Jur. 2d *Arrest* §72, at 720 (2001), see also N. Lopuszynski, *Father Constitution, Tell the Police to Stay on Their Own Side: Can Extra-jurisdictional Arrests Made in Direct Violation of State Law Ever Cross the Fourth Amendment "Reasonableness" Line?*, 53 DePaul L. Rev. 1347, 1358-59 (Spring 2004) (the focus is upon the "immediacy and continuousness of the pursuit"). Given that the Indiana legislature has enacted specific legislation to deal with extraterritorial fresh pursuit arrests within its borders, the question presented is two-fold: What does the Indiana statute require and what happens when those

requirements are not met? Accordingly, the analysis begins with an examination of the language of the statute.

In construing the meaning of a statute, the court's primary objective is to ascertain and give effect to the intent of the drafters (*Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000)), the best indicator being the statute's language (*Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001)). The statutory language must be afforded its plain and ordinary meaning (*In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002)), and, where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction (*In re D.S.*, 217 Ill. 2d 306, 313 (2005)). We will not depart from the plain language of a statute by reading into it exceptions, limitations or conditions that conflict with the express legislative intent. *Petersen v. Wallach*, 198 Ill. 2d 439, 446 (2002). Moreover, this court is bound to give meaning and effect to all the provisions of a statute, and the court must construe a statute so that no word, clause or sentence, to the extent that it is possible to do so, is rendered superfluous or meaningless. *Huskey v. Board of Managers of Condominiums of Edelweiss, Inc.*, 297 Ill. App. 3d 292, 295 (1998); *Walker v. Alton Memorial Hospital Ass'n*, 91 Ill. App. 3d 310 (1980). In construing a statute, we presume that the enacting body did not intend absurdity, inconvenience or injustice. *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 40 (2001). In addition, we view all provisions of an enactment as a whole. *In re Donald A.G.*, 221 Ill. 2d 234, 246 (2006). Accordingly, words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in isolation. *Michigan Avenue National Bank*, 191 Ill. 2d at 504.

Section 35–33–3–1 of Indiana's statute bestows limited authority upon the police officer of another state to arrest an individual in Indiana, and specifically sets forth the circumstances under which a non-Indiana officer may enter that state and make an arrest:

> "Any member of a duly organized state, county or municipal peace unit of another state who enters this state in fresh pursuit, and continues within [Indiana] in such fresh pursuit of a person in order to arrest him on ground that he is believed to have committed a felony in the other state, shall have the same authority to arrest and hold such person in

custody as has any law enforcement officer of this state to arrest and hold in custody a person on the ground that he is believed to have committed a felony in this state." Ind. Code Ann. §35–33–3–1 (Michie 1998).

The plain language of section 35–33–3–1 reveals that the Indiana statute provides authority to an out-of-state law enforcement officer to make an arrest in Indiana, so long as that officer enters Indiana in "fresh pursuit" of that suspect. The statute defines "fresh pursuit" in three ways: as it was "defined by the common law," as "the pursuit of a person who has committed a felony or who reasonably is suspected of having committed a felony," or "the pursuit of a person suspected of having committed a supposed felony, though no felony actually has been committed, if there is reasonable ground for believing that a felony has been committed." Ind. Code Ann. §35–33–3–5 (Michie 1998). The statute further instructs that "[f]resh pursuit shall not necessarily imply instant pursuit, but pursuit without unreasonable delay."[2] Ind. Code Ann. §35–33–3–5 (Michie 1998).

---

[2]I note that in the circuit court, defendant raised in his motion to vacate the denial of his motion to suppress the argument that, based upon the testimony of Officer Luce, "prior to the defendant's arrest at the [Indiana] toll booth the police officers rejected multiple convenient opportunities to arrest the defendant" while he was still in Illinois, and that the "officers themselves chose both the time and place to arrest defendant." The circuit court, however, did not have occasion to address defendant's contention that the officers were not engaged in "fresh pursuit" of him in its factual findings, as the State conceded in the trial court that the arrest took place in Indiana and the Chicago officers did not follow the mandates of the Indiana statute. Having prevailed on the suppression motion in the circuit court, defendant has not pursued this argument on appeal. Although I do not express an opinion as to the merits of defendant's argument with respect to whether the Chicago officers were actually in "fresh pursuit" of him at the time the arrest was made, I do note that a review of Officer Luce's testimony at the suppression hearing indicates that the officers may have had ample opportunity to stop defendant in Illinois, including when defendant parked for a minute at the side of the road near the Burley Avenue address and also after he made what Luce described as an "illegal" U-turn in that same area. It would have been interesting to see how the Indiana court would have ruled on this argument, had the officers complied with the statute and the Indiana

Thus, the Indiana law carves out a limited, statutory exception to the common law general rule that a police officer acting within his official capacity cannot make a warrantless arrest outside the territorial limits of the jurisdiction from which his authority is derived. See, *e.g.*, *Kindred v. Stitt*, 51 Ill. 401, 409 (1869) (at common law, municipal peace officers had no authority to make a warrantless arrest outside of the political entity in which they held office); 2 W. La Fave, J. Israel, N. King & O. Kerr, *Criminal Procedure* §3.5, at 203 (3d ed. 2007), citing *People v. Lahr*, 147 Ill. 2d 379 (1992). In other words, the authority of an out-of-state officer to make an extraterritorial arrest in Indiana is gained only through the grace of Indiana through operation of its statute.

The Indiana statute additionally departs from common law by setting forth with specificity not only the steps that must be taken by an out-of-state police officer after he makes an arrest within Indiana, but also those which must subsequently be taken by the Indiana court. Section 35–33–3–2 provides:

> "If an arrest is made in [Indiana] by an officer of another state in accordance with the provisions of section 1 of this chapter, he shall, without unnecessary delay, take the person arrested before a judge of the county in which the arrest was made. The judge shall conduct a hearing for the purpose of determining the lawfulness of the arrest. If the judge determines that the arrest was lawful, he shall commit the person arrested to await for a reasonable time the issuance of an extradition warrant by the governor of [Indiana]. If the judge determines that the arrest was unlawful, he shall discharge the person arrested." (Emphasis added.) Ind. Code Ann. §35–33–3–2 (Michie 1998).

Thus, the Indiana legislature conditioned an out-of-state officer's authority to make an extraterritorial arrest in Indiana upon the officer's compliance with the dictate that the officer "*shall, without unnecessary delay*, take the person arrested before a judge of the county in which the arrest was made." (Emphasis added.) Ind. Code Ann. §35–33–3–2 (Michie 1998). The use of the word "shall"

---

court had the opportunity to hear the case.

generally indicates a mandatory requirement. See, *e.g.*, *Village of Winfield v. Illinois State Labor Relations Board*, 176 Ill. 2d 54, 64 (1997). The Indiana statute in no uncertain terms requires the out-of-state officer to take the arrestee before an Indiana judge as soon as possible after the arrest. Once that person is brought before the judge, the statute further requires the judge to conduct a hearing "for the purpose of determining the lawfulness of the arrest." Ind. Code Ann. §35–33–3–2 (Michie 1998). The statute then specifies two subsequent options, based upon the outcome of the judicial hearing. If the judge determines that the arrest was lawful, the judge is required to "commit the person arrested to await for a reasonable time the issuance of an extradition warrant by the governor of [Indiana]." Ind. Code Ann. §35–33–3–2 (Michie 1998). If, however, the judge determines that the extraterritorial arrest was unlawful, the statute requires that the judge "shall discharge the person arrested." Ind. Code Ann. §35–33–3–2 (Michie 1998).

Under the plain language of the Indiana statute, the question of whether the officer has made the arrest in fresh pursuit is only the threshold inquiry. The arrest is dependent upon the subjective belief of the arresting officer that there is probable cause that the person committed a criminal offense. The officer's subjective belief is then tested when the facts and circumstances of the encounter are presented to an objective, neutral magistrate. It is only when this magistrate determines that the arrest is lawful that the extraterritorial arrest is deemed complete. This "presentment requirement" is a statutory procedure that did not exist at common law. The requirement advances several important interests. It promotes comity and ensures that the sovereignty of the state entered into by outside officers is preserved; it protects the rights of a person who has been subject to an extraterritorial arrest; and it encourages future compliance with the statutory provisions. Thus, the presentment requirement is an important component of a statutory scheme designed to balance the interests of law enforcement with the rights of the arrestee. It is only by giving meaning to all provisions of the fresh pursuit statute that this balance can be achieved. This interpretation of Indiana's fresh pursuit statute ensures that no provision is rendered superfluous.

My reading of the Indiana statute is supported by an examination of the intent of the drafters of the Uniform Act on Fresh Pursuit of Criminals Across State Lines (Uniform Act), from which the Indiana statute was derived.[3] The Uniform Act was drafted in the mid-1930s by the Interstate Commission on Crime, with the purpose to "prevent criminals from utilizing state lines to handicap police in their apprehension." Council of State Governments, The Handbook on Interstate Crime Control 147 (1978). In order to advance this goal, the Uniform Act addressed the realities faced by law enforcement officers engaging in the fresh pursuit of suspects across state lines:

> "In the foreign state, the pursuing officer from the State where the crime is committed is, in general, no longer an officer. This *** is remedied in a simple manner by this act. Thereunder, the moment an officer in fresh pursuit of a criminal crosses a state line, the state he enters will authorize him to catch and arrest such criminal within its bounds. The statute grants this right only when the officer is in fresh pursuit of a criminal, that is, pursuit without unreasonable delay, by a member of a duly organized peace unit, and only in cases of felonies or supposed felonies occurring outside the boundaries of the state adopting the act. It is thus based upon the little-known common-law doctrine of fresh pursuit, from which the statute has derived its name." Council of State Governments, The Handbook on Interstate Crime Control 147 (1978).

The drafters of the Uniform Act thus believed that the Act would be of benefit to police officers, because although it was "declaratory of the common law," it also clearly informed the officers "of their right to cross a state boundary and make an arrest in fresh pursuit." Council of State Governments, The Handbook on Interstate Crime Control 147 (1978).

---

[3]I note that Illinois also has a "fresh pursuit" statute which is derived from the Uniform Act and which, like Indiana's statute, allows an out-of-state law enforcement officer who is in fresh pursuit of a suspect to arrest that person in Illinois as long as the officer "without unnecessary delay takes[s] the person arrested before the circuit court of the county in which the arrest was made" so that the court can "conduct a hearing for the purpose of determining the lawfulness of the arrest." 725 ILCS 5/107–4 (West 2006).

The Uniform Act, however, was also intended to be of similar benefit to the person arrested under its provisions. The drafters noted that the Act "protects the rights of the person taken into custody, by providing that he shall without unnecessary delay be given a hearing before a magistrate, and requires his extradition if the arrest was lawful." Council of State Governments, The Handbook on Interstate Crime Control 150 (1978). In other words, in the Uniform Act "[s]imple provisions are made to safeguard the rights of the arrested person and to provide for his return to the state where he committed the crime." Council of State Governments, The Handbook on Interstate Crime Control 147 (1978). Thus, it is apparent that the drafters of the Uniform Act intended to delicately balance the competing interests of law enforcement in allowing extraterritorial arrests with the rights of the state in which the arrest occurred and the rights of the person taken into custody. Accordingly, based upon a straightforward interpretation of the Indiana fresh pursuit statute, it is my conclusion that because the Chicago officers failed to comply with that statute's provisions, defendant's extraterritorial arrest was made without statutory authorization.

The majority, however, not only fails to construe Indiana's fresh pursuit statute, but also fails to answer the question of whether defendant's arrest was unauthorized due to the Chicago officers' noncompliance with the Indiana statute. Instead, the majority skips over this necessary analysis and concludes that the exclusionary rule is not an appropriate remedy for the officers' noncompliance with the fresh pursuit statute. The majority's treatment of the issue renders the presentment provisions of the Indiana statute superfluous and a nullity. It is only when the Indiana statutory scheme is properly understood that the importance of the need for the application of the exclusionary rule for its violation becomes apparent.

Like the majority and the special concurrence, I acknowledge that the Indiana statute on fresh pursuit is silent as to the remedy for its violation. However, this question has been addressed by courts in other jurisdictions. Some courts have been unwilling to invoke the exclusionary rule as a remedy to an unlawful extraterritorial arrest. See, *e.g.*, *State v. Dentler*, 742 N.W.2d 84 (Iowa 2007); *State v. Ferrell*, 218 Neb. 463, 468, 356 N.W.2d 868, 871 (1984). Other courts, however, have found that the exclusionary rule is the

appropriate remedy to apply. See, *e.g.*, *United States v. Holmes*, 380 A.2d 598 (D.C. App. 1977); *Commonwealth v. Savage*, 430 Mass. 341, 719 N.E.2d 473 (1999); *Commonwealth v. Sadvari*, 561 Pa. 588, 752 A.2d 393 (2000). The leading case adopting this latter position is the Pennsylvania Supreme Court's decision in *Sadvari*, which I find to be persuasive.

In *Sadvari*, two Pennsylvania state troopers, while on patrol near the Pennsylvania-Delaware border, observed a vehicle driven by the defendant, a Delaware resident, which was speeding. The troopers pursued the vehicle and, shortly after crossing into Delaware, they activated their emergency lights and stopped the defendant approximately four-tenths of a mile inside the State of Delaware. *Sadvari*, 561 Pa. at 590, 752 A.2d at 394. Subsequently, the defendant was asked to perform field sobriety tests, which he failed. He was then arrested for drunk driving by the Pennsylvania officers and was transported to a Pennsylvania hospital where blood samples were drawn for chemical testing. *Sadvari*, 561 Pa. at 591, 752 A.2d at 394.

Prior to trial, Sadvari moved to suppress evidence related to the traffic stop as the product of an unlawful arrest. According to the defendant, his arrest was unlawful because it was not conducted in accordance with Delaware's fresh pursuit statute. The trial court found that the Pennsylvania officers had probable cause to stop Sadvari and that the Delaware statute granted them authority to enter Delaware while in fresh pursuit and conduct an arrest. *Sadvari*, 561 Pa. at 591, 752 A.2d at 395. While the trial court agreed that, under the relevant provisions of the Delaware statute, the defendant should have been taken before a Delaware judge, it viewed this requirement simply as an extradition provision and denied Sadvari's suppression motion. *Sadvari*, 561 Pa. at 593, 752 A.2d at 396. The Pennsylvania appellate court affirmed. *Sadvari*, 561 Pa. at 593, 752 A.2d at 396.

The Pennsylvania Supreme Court reversed. That court first noted that, as is the case with the Indiana statute in the instant appeal, the Delaware statute also derived from the Uniform Act on the Fresh Pursuit of Criminals Across State Lines. *Sadvari*, 561 Pa. at 598, 752 A.2d at 398. The court held that the trial court's conclusion that the Delaware statute did not require a justice of the peace to determine whether the arresting officer complied with the Delaware statute was

-43-

in error. The Delaware statute–as does the Indiana statute in the case before us–plainly required the justice of the peace to "determine the lawfulness of the arrest," and the court observed that there was no authority for a uniformed Pennsylvania trooper in a marked police cruiser to effectuate an extraterritorial arrest in Delaware other than the Delaware fresh pursuit statute. *Sadvari*, 561 Pa. at 598, 752 A.2d at 398. Accordingly, to comply with the mandate of the statute to evaluate the lawfulness of an arrest, a Delaware tribunal was required to assess the arresting officers' compliance with the statute. However, because the officers did not comply with the condition imposed upon their authority under the Delaware statute–which required them to bring Sadvari before a Delaware justice of the peace–the court found the arrest to be illegal. *Sadvari*, 561 Pa. at 598, 752 A.2d at 398.

The *Sadvari* court then considered the appropriate remedy for the statutory violation and concluded that suppression of the evidence obtained as a result of the unlawful arrest was warranted. The court conceded that not every violation of a statute or rule requires suppression. On the one hand, the court observed that it could be argued that the Delaware statute merely duplicated the framework provided by Pennsylvania law and its procedural rules for safeguarding a defendant's constitutional rights; therefore, in individual cases a remedy as exacting as suppression should not be deemed necessary. The court found, however, that the Delaware statute, with its directive that an out-of-state officer present the arrestee to a Delaware judicial tribunal for review of the lawfulness of an arrest conducted in Delaware, "functions as more than merely an extradition statute, and that a contrary interpretation would render empty the mandate of the Delaware law." *Sadvari*, 561 Pa. at 598, 752 A.2d at 398-99. The court noted that under its prior state jurisprudence, the exclusionary rule had previously been employed to ensure the orderly administration of justice where a police officer acted without authority, even in cases in which constitutional rights were not at the forefront. In this instance, the court determined that application of the exclusionary rule served several different and important interests: "as a demonstration of comity to vindicate Delaware's sovereignty in light of Pennsylvania's incursion upon this important state interest," as a means "to encourage future compliance with Delaware's procedures,"

and also to "safeguard the individual right to be free of unlawful seizures." *Sadvari*, 561 Pa. at 598-99, 752 A.2d at 399.

As stated, I find the Pennsylvania Supreme Court's reasoning and holding in *Sadvari* to be persuasive. Its analysis most closely mirrors the intent of the drafters of the Uniform Act and is true to the language of the statute by giving each provision meaning. The *Sadvari* decision also highlights the several important interests that are affected by operation of the fresh pursuit statute: a demonstration of comity to vindicate the sovereignty of the state that has experienced the incursion of out-of-state officers; encouragement of future compliance with the provisions of the statute; and the protection of a defendant's rights to due process and to be free from unlawful seizures. It is my view that *Sadvari* appropriately balances these important interests against the similarly important interest in furthering legitimate law enforcement objectives in allowing extraterritorial arrests, and arrives at the correct result.

However, although *Sadvari* is factually analogous to the matter before us, and is relied upon by defendant in his arguments to this court and by the appellate court in its opinion below, neither the majority nor the special concurrence discuss why *Sadvari* is not persuasive. Instead, the majority states that it finds the analysis in *Dentler* "particularly instructive" (slip op. at 27), and the special concurrence joins in this assessment. I note, however, that *Dentler* is factually distinguishable from the matter at bar, and that this factual difference played a significant role in that court's analysis as to whether the exclusionary rule should be applied. In *Dentler*, Iowa police officers pursued the defendant into Missouri, but, while in pursuit, also notified the Missouri authorities and requested their assistance in apprehending the suspect. Two Missouri law enforcement officers came to the scene of the arrest and engaged in a discussion with the Iowa officers as to which jurisdiction would retain the defendant. According to the court's opinion, "The Missouri deputies advised [the Iowa officers], 'Well you can keep [defendant].' " *Dentler*, 742 N.W.2d at 86. In addition, the court noted that it was undisputed that Dentler was thereafter promptly taken before an Iowa judge. In holding that the exclusionary rule was not an appropriate remedy under the facts presented, the *Dentler* court noted that "it [was] undisputed that the Missouri officers on the

scene acquiesced to the action. While such acquiescence by state law enforcement officials may not give rise to waiver or estoppel as a matter of law, it is a factor that militates against the need for application of the exclusionary rule." *Dentler*, 742 N.W.2d at 89. The facts in *Dentler* are inapposite to those at bar. In the matter before us, the Chicago officers made no contact with Indiana law enforcement officials during the arrest of defendant on Indiana soil. In addition, I note that rather than taking defendant before an Indiana magistrate, as required under the provisions of the statute, the Chicago officers instead transported defendant back across the state line to Illinois, and then took him to his mother's residence on Burley Avenue. The officers thereupon conducted–according to their testimony–a "consent" search of the home in conjunction with their narcotics investigation of defendant. It was only after the officers conducted a systematic search of these premises and discovered additional evidence to be used in their prosecution of defendant that they transported defendant to the police station and he was brought before an Illinois magistrate. Accordingly, I find *Dentler* to be unpersuasive for a number of reasons: it is factually distinguishable from the matter at bar, and it does not speak to the intent of the drafters of the Uniform Act, from which the statute at issue in that case was derived.

Further, and perhaps more importantly, support for my position is found in our own, well-settled, state jurisprudence. Almost 30 years ago, our appellate court in *People v. Jacobs*, 67 Ill. App. 3d 447 (1979), addressed a situation factually similar to the matter now before us. In *Jacobs*, Illinois police officers in fresh pursuit of the defendant arrested him inside the State of Iowa for his alleged commission of robbery and murder. As in the present matter, the Illinois police officers failed to comply with the presentment provisions of Iowa's fresh pursuit law. *Jacobs* held that the extraterritorial arrest of defendant was illegal because the Illinois officers "had no authority to arrest him in the State of Iowa except for that authority granted to them by the Uniform Fresh Pursuit Law of the State of Iowa." *Jacobs*, 67 Ill. App. 3d at 449. The court held the arrest to be illegal, and the defendant's statements were suppressed as the fruits of an illegal arrest. The court reasoned:

> "The defendant was indeed illegally arrested since the
> Illinois police officers had no authority to arrest him in the

State of Iowa except for that authority granted to them by the Uniform Fresh Pursuit Law of the State of Iowa. [Citations.] ***

*** [The statute] mandates that an out-of-State police officer, after effecting an arrest, shall without unnecessary delay take the person arrested before a magistrate of the county in which the arrest was made, who shall conduct a hearing for the purpose of determining the lawfulness of the arrest. If the magistrate determines that the arrest was lawful, he shall commit the person arrested to await for a reasonable time the issuance of an extradition warrant by the governor. [Citation.]

None of the mandates set forth in the Uniform Fresh Pursuit Law of Iowa were complied with by the arresting officers from Illinois. They were both blithely and summarily ignored and the defendant immediately upon his return to Illinois was subjected to intensive interrogation." *Jacobs*, 67 Ill. App. 3d at 449-50.

I find the reasoning in *Jacobs* to be persuasive and note that this case has been law in this state for nearly three decades. I also observe that the failure of the officers in *Jacobs* to bring the defendant before an Iowa magistrate immediately following his arrest allowed the Illinois officers to return the defendant to Illinois and to conduct an immediate and lengthy interrogation in which they were able to gather additional evidence against the defendant prior to taking him before an Illinois judge. This factual scenario mirrors that in the matter at bar, where the officers returned defendant to Illinois and, rather than taking him before an Illinois judge, first took a detour to the home of defendant's mother and engaged in a "consent" search of those premises in an effort to gather additional evidence against defendant prior to taking him before an Illinois judge.

I further note that the fact that it has been nearly three decades since our courts have been presented with an issue similar to that in *Jacobs* underscores that the reasoning and holding in that case offered a workable and effective procedure to be followed by officers making an extraterritorial, fresh pursuit arrest. To be blunt, to date, interstate

extraterritorial arrests have not been a problem in Illinois. Clearly, then, *Jacobs* has been well understood by law enforcement officers, who have been cognizant of the state boundaries of their authority and of the consequences of attempting to exercise that authority outside the Illinois state line without complying with a sister state's statutory provisions. One thus could argue that society has already benefitted (see slip op. at 31) in Illinois from the uniform, 30-year application of the exclusionary rule to cases such as this. The court does not explain how its result today provides additional societal benefit.

I note that, although factually not directly on point, this court in *People v. Carrera*, 203 Ill. 2d 1 (2002), upheld the suppression of evidence obtained by police during the course of an unlawful, extraterritorial arrest. In *Carrera*, Chicago police officers arrested the defendant in Franklin Park, Illinois, relying upon an Illinois statute that permitted intrastate extraterritorial arrests but which was, subsequent to the defendant's arrest, held to be unconstitutional on the basis that it was part of a public act that was passed in violation of the single-subject rule. In holding that defendant's suppression motion had been properly granted, this court first looked to its prior decision in *People v. Lahr*, 147 Ill. 2d 379 (1992), wherein the court suppressed evidence obtained during the course of an extraterritorial arrest. *Carrera* then held that the statute upon which the police relied to effect the arrest was void *ab initio* due to its inclusion in a public act that was found to violate the single-subject rule, and, therefore, the police had no statutory authority to arrest the defendant. This court concluded that "Illinois law is settled that the exclusionary rule is applicable where the police effectuate an extraterritorial arrest without appropriate statutory authority." *Carrera*, 203 Ill. 2d at 11.

In support of its holding that defendant's arrest should not be quashed nor the evidence against him suppressed, the majority engages in a quick and summary disposal of defendant's reliance upon *Jacobs*, *Lahr*, and *Carrera*. The majority states that the "cases defendant cites do not settle this case as a *matter of law*" (emphasis added) (slip op. at 25), but then attempts to *factually distinguish* the cases from that at bar. With respect to *Carrera* the opinion states:

> "In *Carrera*, the defendant was arrested by police officers utilizing a statute that was later declared void *ab initio*.

[Citation.] Accordingly, this court held that the defendant's arrest was unlawful." Slip op. at 25.

This is the sum and substance of the majority's factual distinction of *Carrera* from the matter at bar. I believe that this is a distinction which fails. The fact that the statute at issue in *Carrera* was void *ab initio* was not what animated this court to hold that "Illinois law is settled that the exclusionary rule is applicable where the police effectuate an extraterritorial arrest without appropriate statutory authority." Rather, this court relied on its prior decision in *Lahr*, which had already established this proposition. In addition, it was the fact that the officers were acting *without legal authority*–just as alleged in the case at bar–that controlled the result in *Carrera*.

In sum, courts of this state have long used the exclusionary rule to protect the rights of defendants outside of the constitutional context. To hold as the majority does today renders the provisions of Indiana's fresh pursuit statute a nullity. The majority fails to adhere to the familiar tenets of statutory construction: it fails to afford plain meaning to the language of the Indiana statute; it fails to adhere to the intent of the drafters of the Uniform Act; it fails to afford appropriate recognition to the principles of comity to vindicate Indiana's sovereignty; it fails to safeguard the protections intended to be afforded to defendants by the statute; and it fails to follow our own precedent. In rendering the provisions of the Indiana fresh pursuit statute superfluous, the majority leaves the distinct impression that Illinois law enforcement officers may freely disregard statutory limits on their jurisdiction with no adverse consequences. In light of the fact that Illinois has enacted a similar fresh pursuit statute, I question whether out-of-state officers who make an extraterritorial arrest on our own soil would feel compelled to comply with the provisions of the Illinois statute after today's decision. More importantly, would an Indiana court feel compelled to follow the dictates of the Illinois General Assembly, when this court so freely ignores the will of the Indiana legislature?

For all the foregoing reasons, I cannot join the opinion of the majority.

JUSTICE KILBRIDE joins in this dissent.